1  MELINDA HAAG (CABN 132612)
   United States Attorney
2
   J. DOUGLAS WILSON (DCBN 412811)
3  Chief, Criminal Division

4  WILLIAM FRENTZEN (LABN 24421)
   SUSAN BADGER (CABN 124365)
5  S. WAQAR HASIB (CABN 234818)
   Assistant United States Attorneys
6
         450 Golden Gate Avenue, Box 36055
7        San Francisco, California 94102-3495
         Telephone: (415) 436-7200
8        FAX: (415) 436-6753
         William.frentzen@usdoj.gov
9
   Attorneys for United States of America
10

11              UNITED STATES DISTRICT COURT

12              NORTHERN DISTRICT OF CALIFORNIA

13                  SAN FRANCISCO DIVISION

14                                          3  14   7 0 4 2 1    NC

15 IN RE: CRIMINAL COMPLAINT          )   AFFIDAVIT OF SPECIAL AGENT EMMANUEL
                                      )   V. PASCUA IN SUPPORT OF COMPLAINT
16                                    )
                                      )
17                                    )
                                      )
18                                    )
                                      )
19 _____ )

20

21      I, Emmanuel V. Pascua, Special Agent with the Federal Bureau of Investigation, being duly

22 sworn, depose and state that:

23 **I.      BACKGROUND**

24      *A.      AGENT QUALIFICATIONS*

25      I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been so employed since

26 August 2004.  During my employment as a Special Agent, I have been tasked with domestic terrorism

27 and organized crime investigations.  Based on these investigations, I have gained experience in the use

28

                                          1

of law enforcement techniques including the use of confidential sources, undercover operations, physical surveillance tools such as pole cameras, recorders, and global position satellite enabled tracking devices, and other electronic surveillance tools such as body wires and transmitters. Additionally, I have gained experience in analyzing telephone toll records, financial records and utility records. I have been involved in operations and investigations involving drug evidence and the utilization of buy/bust techniques since 2004. I have received additional training on financial investigations, specifically investigations dealing with money laundering activities.

As a result of my experience, I have encountered and become familiar with the day to day operations and the various practices of individuals involved in organized crime. I have also consulted and discussed these types of investigations with federal agents, state and local police officers, and attorneys who are experienced in investigations involving organized crime. I have discussed the topic of firearms trafficking with two FBI Firearms Instructors, specifically on the topic of items indicative of firearms trafficking.

I have been an affiant on one Title III affidavit involving subjects named in section II of this affidavit engaged in organized crime activity and have participated in at least three other investigations involving the interception of communications pursuant to Title III. As a result of this experience, I am familiar with the use of wiretaps as an investigative technique.

I have been an affiant on at least 13 search warrants for residences, vehicles, electronic devices, DNA and cellular telephone GPS information. The majority of these search warrants involved the investigation of organized criminal activity.

I am an investigative or law enforcement officer of the United States, within the meaning of 18 U.S.C. § 2510(7), and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in 18 U.S.C. § 2516.

I am making this affidavit in support of a complaint for the issuance of arrest warrants for the

2

1   Targets included in Part B of this Section of the affidavit, for violations of the Statutes included in Part

2   C of this Section of the affidavit.

### B.    COMPLAINANTS

**Kwok Cheung CHOW, a/k/a Raymond Chow, a/k/a Shrimp Boy, a/k/a Ha Jai** (hereinafter

CHOW) is a 54-year old Chinese citizen who is believed to reside in San Francisco, California.  Based

on publicly available information as well as information from confidential human sources and other

sources of information, CHOW is currently the Dragonhead, or leader, of the San Francisco-based Chee

Kung Tong organization (herein "CKT").[1]  CHOW's criminal history includes a guilty plea in federal

court for racketeering, involving murder for hire, conspiracy to distribute heroin, arson, and conspiracy

to collect extensions of credit.  He also has state felony convictions for robbery using a firearm and

assault with a firearm on a person, and served time in state prison on both charges.  He is currently in

this country while awaiting resolution of an application to U.S. Immigration and Customs Enforcement

(ICE) to obtain an S-visa (which is a type of visa issued to witnesses in criminal proceedings).  As a

---

[1] The CKT is believed to be an offshoot of the Hung Mun.  Based on my review of open source
information, I am aware that the Hung Mun, also referred to as a Chinese secret society and the Chinese
Freemasons, among other names, began in China sometime in the mid-17th century as a result of a
revolutionary movement to overthrow the Manchu-ruled Qing Dynasty in China.  The Qing Dynasty
lasted roughly from 1644 to 1911.  The Hung Mun were aggressively pursued and punished by the Qing
Dynasty rulers throughout their existence.  This persecution, along with cultural and economic
influences drove these societies underground, causing them to adopt secretive customs, rules,
ceremonies and operating procedures.  Hung Mun members who emigrated from China throughout the
world in the mid-late 19th century brought their Hung Mun customs and rituals with them to their new
homes abroad and numerous organizations sprung from these Hung Mun roots.  Many of these
organizations became known as Tongs in the United States.  Many of the Tongs maintained their
secretive hierarchies, rituals and ceremonies but were able to operate much more openly outside China
without the threat of government persecution and retribution.  Most Tongs shared the political goal of
overthrowing the Manchu dynasty that ruled China; however, some were purely social groupings that
focused on mutual aid and recreation for members.  Others served administrative and judicial functions
within the community, allocating business locations and cemetery sites, settling disputes, and enforcing
the payment of debts.  Still others engaged in criminal activities: protection rackets, extortion, and
strong-arm methods for controlling such tolerated vices as gambling and prostitution.
One such organization which later became one of the strongest and most influential in North America is
the Chee Gung Tong, or Chee Kung Tong, also known as the CKT, headquartered in San
Francisco.  The CKT and its criminal activities have been of interest to law enforcement since at least as
early as 2006, when the CKT's previous Dragonhead, Allen Leung, was murdered in San Francisco.

3

1  result of this application, CHOW currently wears an ankle bracelet and is under the supervision of an

2  ICE deportation officer. According to a plea agreement that CHOW signed when pleading guilty to

3  federal racketeering charges in 2000, CHOW was at that time an admitted member of the San

4  Francisco-based Hop Sing Tong (herein "HST")[2] and one of the leaders of criminal activities engaged

5  in by the underlings of this organization. As part of his role in this organization, CHOW engaged in

6

7  such activities as heroin and cocaine trafficking, attempted murder, arson, robbery, gambling and

8  extortionate credit transactions. CHOW was sentenced to a total of 160 months on these charges, but

9  ultimately served a shorter sentence after receiving consideration for cooperating in United States v.

10  Chong, CR-92-00260-DLJ. In August of 2006, after being released from federal incarceration, CHOW

11  was sworn in as the new Dragonhead, or leader, of the CKT, soon after the murder of the previous

12  Dragonhead, Allen Ngai Leung; that murder remains unsolved. News of CHOW's rise to the

13  Dragonhead position was reported in local Chinese media sources, and was also reported to the FBI by

14  multiple confidential sources; as a result, both the San Francisco Police Department and the FBI

15

16  conducted surveillance at his swearing-in. Based on information that has been received by FBI agents

17  from confidential human sources, as CKT Dragonhead CHOW holds a "489" position in the Triad,

18  which is an internationally-based Chinese organized crime group. The "489" position signifies supreme

19  authority within the Triad, and is consistent with CHOW's position as Dragonhead of the CKT. Also

20  according to confidential human sources, CHOW is believed to have ties with Triad members in China

21

22  and Hong Kong. Also, according to information received by the FBI, CHOW is currently, or was until

23  recently, the leader of the Hop Sing Gang, a local San Francisco street gang that has approximately

24  200-300 members. As discussed in further detail below, CHOW has used his position in these

25

26  [2]My review of information relating to the HST leads me to believe that, much like the CKT, it was at
   one time a civic organization within the Chinese community that became involved in criminal activity as
27  a result of Asian organized crime influences. The HST and its criminal activities have been of interest
   to law enforcement since at least as early as the 1990s, when the HST was being investigated for its
28  connections to Asian organized crime.

organizations to sanction and encourage George NIEH and other Target Subjects to engage in money

laundering and possibly other criminal activities with an undercover employee (UCE) of the FBI. I

believe that the facts detailed below are sufficient to demonstrate probable cause to believe that CHOW

has violated the following criminal statutes: Title 18, United States Code, Sections 1956(a)(3)(A) and

(B) and 2 (Money Laundering of Funds Believed to be Proceeds of Specified Unlawful Activity); Title

18, United States Code, Section 1956(a)(1)(A) and (B) (Money Laundering); Title 18, United States

Code, Sections 371, 2314, and 2315 (Conspiracy to Receive and Transport Stolen Property in Interstate

Commerce); and Title 18, United States Code, Sections 371, 2342 and 2344 (Conspiracy to Traffic and

Trafficking in Contraband Cigarettes).

**Leland Yin YEE, a/k/a California State Senator Leland Yee, a/k/a Uncle Leland** (hereinafter

SENATOR YEE) is a 65 year-old U.S. citizen believed to reside in San Francisco, California.

SENATOR YEE currently represents California legislative District 8, which encompasses San Mateo

County and part of San Francisco County. Senator YEE's term will end on December 16, 2014.

SENATOR YEE unsuccessfully ran for Mayor of San Francisco in the election held on November 8,

2011, and is currently running for California Secretary of State in an election to be held in November

2014. As further detailed below, SENATOR YEE and KEITH JACKSON were involved in a scheme to

defraud the citizens of California of their rights to honest services, and SENATOR YEE, LIM and

KEITH JACKSON were involved in a conspiracy to traffic firearms. I believe that the facts detailed

below are sufficient to demonstrate probable cause to believe that SENATOR YEE has violated the

following criminal statutes: Title 18, United States Code, Section 1343 and 1346 (Wire Fraud of Honest

Services); Title 18, United States Code, Sections 371, 922(a)(1) and 922(l) (Conspiracy to Deal

Firearms Without a License and to Illegally Import Firearms).

**Keith JACKSON** (hereinafter KEITH JACKSON) is a 49 year-old United States citizen,

believed to reside in San Francisco, California. KEITH JACKSON works as a political consultant.

KEITH JACKSON has no known criminal convictions.  As further detailed below, KEITH JACKSON was involved in a scheme to defraud of honest services, a murder for hire conspiracy, gun trafficking, and drug trafficking conspiracy.  I believe that the facts detailed below are sufficient to demonstrate probable cause to believe that KEITH JACKSON has violated the following criminal statutes: Title 18, United States Code, Section 1343 and 1346 (Wire Fraud of Honest Services); Title 21, United States Code, Section 846 (Conspiracy to Distribute Narcotics); Title 18, United States Code, Section 922(a)(1) and 2 (Dealing in Firearms Without a License); Title 18, United States Code, Sections 371, 922(a)(1) and 922(l) (Conspiracy to Deal Firearms Without a License and to Illegally Import Firearms); and Title 18, United States Code, Section 1958 (Murder for Hire).

**Kevin SIU, a/k/a Dragon Tin Loong Siu** (hereinafter SIU).  SIU is a 30 year-old U.S. citizen who is believed to reside in Daly City, California.  SIU has two prior arrests; one for prostitution and another related to loitering to commit prostitution.  He is believed to own a business which is involved in the sale of electronic cigarettes.  As described in further detail below, CHOW and NIEH introduced SIU to a UCE as someone who could launder money.  Since then, SIU engaged in several money laundering transactions with a UCE.  SIU also told a UCE that SIU was a member of the CKT, or possibly the CKT's secretary; however, as described in further detail below, SIU and CHOW have since had a falling-out.  Accordingly, SIU's current relationship to the CKT is unknown.  I believe that the facts detailed below are sufficient to demonstrate probable cause to believe that SIU has violated the following criminal statutes: Title 18, United States Code, Sections 1956(a)(3)(A) and (B) and 2 (Money Laundering of Funds Believed to be Proceeds of Specified Unlawful Activity).

**George NIEH, a/k/a Heng Nieh, a/k/a Ah Fei** (hereinafter NIEH) is a 44 year-old U.S. citizen who is believed to reside in San Francisco, California.  According to California state employment records, he has no known employment records for the last three years.  NIEH has a previous California state felony conviction for assault.  NIEH has told a UCE that NIEH is a member of the CKT.  NIEH

6

has claimed to a UCE that he is the leader of the Wah Ching, a local street gang, with approximately 60

members. NIEH claims to be a close associate and driver of CHOW. I believe that the facts detailed

below are sufficient to demonstrate probable cause to believe that NIEH has violated the following

criminal statutes: Title 18, United States Code, Sections 1956(a)(3)(A) and (B) and 2 (Money

Laundering of Funds Believed to be Proceeds of Specified Unlawful Activity); Title 18, United States

Code, Section 1956(a)(1)(A) and (B) (Money Laundering); Title 18, United States Code, Sections 371,

2314, and 2315 (Conspiracy to Receive and Transport Stolen Property in Interstate Commerce); Title

18, United States Code, Sections 371, 2342 and 2344 (Conspiracy to Traffic and Trafficking in

Contraband Cigarettes); Title 21, United States Code, Section 846 (Conspiracy to Distribute Narcotics);

Title 18, United States Code, Section 922(a)(1) and 2 (Dealing in Firearms Without a License); and Title

18, United States Code, Section 922(g)(1) (Felon in Possession of a Firearm).

     **Alan CHIU, a/k/a Alan Shiu** (hereinafter CHIU) is a 58 year-old U.S. citizen who is believed to

reside in San Francisco, California. He has no known criminal history. He is believed to currently be

employed by Men's Wearhouse, Inc. Based on representations made to a UCE by CHIU, NIEH and

others, CHIU is believed to be a member of the CKT and a close associate of CHOW. I believe that the

facts detailed below are sufficient to demonstrate probable cause to believe that CHIU has violated the

following criminal statute: Title 18, United States Code, Sections 1956(a)(3)(A) and (B) and 2 (Money

Laundering of Funds Believed to be Proceeds of Specified Unlawful Activity).

     **Xiao Cheng MEI, a/k/a Michael Mei** (hereinafter MEI) is a 30 year-old U.S. citizen, believed

to reside in Daly City, California. MEI has no known criminal history. MEI is a close associate of

CHOW and NIEH, and is also believed to be a CKT member. NIEH stated to UCE 4599 that MEI

would be a potential business associate regarding marijuana cultivation and distribution. NIEH has

further stated to UCE 4599 that MEI is vying for a position within the CKT similar to the position SIU

previously held. NIEH advised UCE 4599 that MEI may also be a supplier for firearms. As described

in further detail below, a search warrant was executed at a residence in Antioch and was suspected to be

a marijuana grow house belonging to MEI. I believe that the facts detailed below are sufficient to

demonstrate probable cause to believe that SIU has violated the following criminal statute: Title 21,

United States Code, Section 846 (Conspiracy to Distribute Narcotics).

**Andy LI, a/k/a Andy Man Lai LI, a/k/a Andy M. LI** (hereinafter LI) is a 40 year-old U.S.

citizen, believed to reside in South San Francisco, California. LI has a misdemeanor conviction for

arson dating from June 1992 in California. LI also has a felony conviction for being an accessory to

robbery in July 1993 in California. LI also has federal felony convictions for theft from interstate

shipments, in violation of 18 U.S.C. § 659. LI in past was a close associate of CHOW, but recently had

an altercation with CHOW causing their relationship to end. LI may no longer be a CKT member. As

described in further detail below, LI has engaged in money laundering (proceeds are believed to be from

illegal drug trafficking), sold controlled substances to a FBI UCE, conspired to distribute controlled

substances with an FBI UCE, facilitated the sale of a firearm to an FBI UCE and provided a ballistic

vest to an FBI UCE. I believe that the facts detailed below are sufficient to demonstrate probable cause

to believe that LI has violated the following criminal statutes: Title 18, United States Code, Section

1956(a)(1)(A) and (B) (Money Laundering); Title 21, United States Code, Section 846 (Conspiracy to

Distribute Narcotics); Title 18, United States Code, Section 922(a)(1) and 2 (Dealing in Firearms

Without a License); and Title 18, United States Code, Section 922(g)(1) (Felon in Possession of a

Firearm).

**Kongphet CHANTHAVONG, a/k/a Joe** (hereinafter CHANTHAVONG) is a 36 year old

Thailand citizen who is believed to reside in San Francisco, California. U.S. Immigration records show

that CHANTHAVONG has an outstanding warrant of deportation; however, country conditions

preclude deportation. CHANTHAVONG's criminal history includes two state felony convictions for the

possession and/or purchase of cocaine base for sale, and a felony conviction for conspiracy to export

stolen vehicles. CHANTHAVONG was at one time a CKT member and close associate of CHOW, but because of his affiliation with LI, it is believed that CHANTHAVONG no longer has a relationship with CHOW, nor is he a member of the CKT. CHANTHAVONG was recently introduced by NIEH to a FBI UCE as a marijuana trafficker. As described in further detail below, CHANTHAVONG has distributed controlled substances, conspired to distribute controlled substances with an FBI UCE and firearms trafficking. I believe that the facts detailed below are sufficient to demonstrate probable cause to believe that CHANTHAVONG has violated the following criminal statutes: Title 21, United States Code, Section 846 (Conspiracy to Distribute Narcotics); Title 21, United States Code, Section 841 (Possession with Intent to Distribute Narcotics); Title 18, United States Code, Section 924(c) (Possession of a Firearm in Furtherance of a Drug Trafficking Crime); Title 18, United States Code, Section 922(a)(1) and 2 (Dealing in Firearms Without a License); and Title 18, United States Code, Section 922(g)(1) (Felon in Possession of a Firearm).

**Jane Miao Xhen LIANG, a/k/a Jane LIANG** (hereinafter JANE LIANG) is a 35 year-old U.S. citizen, believed to reside in Daly City, California. JANE LIANG does not have a criminal history. As detailed further below, JANE LIANG has facilitated a purported stolen liquor transaction with an FBI UCE. I believe that the facts detailed below are sufficient to demonstrate probable cause to believe that JANE LIANG has violated the following criminal statutes: Title 18, United States Code, Sections 371, 2314, and 2315 (Conspiracy to Receive and Transport Stolen Property in Interstate Commerce).

**Tina Yao Gui LIANG, a/k/a Tina LIANG** (hereinafter TINA LIANG) is a 39 year-old U.S. citizen, believed to reside in Concord, CA. TINA LIANG has no known criminal history. TINA LIANG is an associate of CHOW. CHOW directly introduced TINA LIANG to an FBI UCE to conduct criminal activity. As detailed further below, TINA LIANG participated in a purportedly stolen liquor transaction with an FBI UCE and is believed to be involved in cultivating and distributing marijuana. I believe that the facts detailed below are sufficient to demonstrate probable cause to believe that TINA

9

1   LIANG has violated the following criminal statutes: Title 18, United States Code, Sections 371, 2314,

2   and 2315 (Conspiracy to Receive and Transport Stolen Property in Interstate Commerce) and Title 21,

3   United States Code, Section 846 (Conspiracy to Distribute Narcotics).

4          **Bryan TILTON** (hereinafter TILTON) is a 37 year-old U.S. citizen, believed to reside in Daly

5   City, California.  TILTON has no known criminal convictions.  TILTON is an associate of TINA

6   LIANG and JANE LIANG.  As detailed further below, TILTON participated in a purportedly stolen

7   liquor transaction with an FBI UCE and is believed to be involved in cultivating and distributing

8

9   marijuana. I believe that the facts detailed below are sufficient to demonstrate probable cause to believe

10  that TILTON has violated the following criminal statutes: Title 18, United States Code, Sections 371,

11  2314, and 2315 (Conspiracy to Receive and Transport Stolen Property in Interstate Commerce) and Title

12  21, United States Code, Section 846 (Conspiracy to Distribute Narcotics).

13         **Huan Ming MA, a/k/a Ming MA, a/k/a Bak Baan** (hereinafter MA) is a 29 year-old U.S.

14  Legal Resident, believed to reside at in San Francisco, California.  MA has no known criminal

15

16  convictions.  MA is a member of the CKT and holds the position of Enforcer.  Detailed further below,

17  MA facilitated the purchase of purportedly stolen liquor with an FBI UCE.  I believe that the facts

18  detailed below are sufficient to demonstrate probable cause to believe that MA has violated the

19  following criminal statutes: Title 18, United States Code, Sections 371, 2314, and 2315 (Conspiracy to

20  Receive and Transport Stolen Property in Interstate Commerce).

21         **Hon Keung SO, a/k/a Hon SO** (hereinafter SO) is a 55 year-old United States Legal Resident,

22  believed to reside in Alameda, California and to own the New Asian Restaurant in San Francisco,

23

24  California.  SO was state convicted of driving under the influence (DUI) in February 2003.  SO is

25  known to host many of the CKT events at the New Asia Restaurant and has purchased purportedly

26  stolen liquor from an FBI UCE.  I believe that the facts detailed below are sufficient to demonstrate

27  probable cause to believe that MA has violated the following criminal statutes: Title 18, United States

28

Code, Sections 371, 2314, and 2315 (Conspiracy to Receive and Transport Stolen Property in Interstate

Commerce).

**Albert NHINGSAVATH, a/k/a Al NHINGSAVATH** (hereinafter NHINGSAVATH) is a 32

year-old U.S. citizen, believed to reside in San Francisco, California.   NHINGSAVATH's criminal

history includes one federal felony conviction for distribution of MDMA, in violation of 21 U.S.C. §

846 in May 2005.  NHINGSAVATH is a close associate of LI and CHANTHAVONG.  As detailed

further below, NHINGSAVATH engaged in money laundering (proceeds are believed to be from illegal

drug trafficking) and conspired to distribute controlled substances with an FBI UCE.  I believe that the

facts detailed below are sufficient to demonstrate probable cause to believe that CHANTHAVONG has

violated the following criminal statutes: Title 18, United States Code, Section 1956(a)(1)(A) and (B)

(Money Laundering); and Title 21, United States Code, Section 846 (Conspiracy to Distribute

Narcotics).

**Norge Ronald MASTRANGELO** (hereinafter MASTRANGELO) is a 37 year-old United

States citizen, believed to reside in San Francisco, California.  MASTRANGELO's criminal history

includes a state misdemeanor conviction for criminal possession of a Controlled Substance – 7th degree

in New York.  As further detailed below, MASTRANGELO was involved in money laundering with an

FBI UCE.  I believe that the facts detailed below are sufficient to demonstrate probable cause to believe

that MASTRANGELO has violated the following criminal statutes: Title 18, United States Code,

Section 1956(a)(1)(A) and (B) (Money Laundering).

**Anthony John LAI, a/k/a AJ** (hereinafter LAI) is a 26 year-old U.S. citizen, believed to reside

in Daly City, California.  LAI is an associate of GEE and ELAINE LIANG.  LAI has no known criminal

convictions.  As detailed further below, LAI was involved in money laundering (proceeds are believed

to be from illegal drug trafficking) with an FBI UCE and conspired to distribute illegal drugs.  I believe

that the facts detailed below are sufficient to demonstrate probable cause to believe that LAI has violated

11

the following criminal statutes: Title 18, United States Code, Section 1956(a)(1)(A) and (B) (Money Laundering); and Title 21, United States Code, Section 846 (Conspiracy to Distribute Narcotics).

**Serge GEE, a/k/a John** (hereinafter GEE) is a 28 year-old United States citizen, believed to reside in Cupertino, California. GEE's criminal history includes battery as a juvenile with no disposition. As further detailed below, GEE was involved in money laundering with an FBI UCE and the distribution of illegal drugs. I believe that the facts detailed below are sufficient to demonstrate probable cause to believe that GEE has violated the following criminal statutes: Title 18, United States Code, Section 1956(a)(1)(A) and (B) (Money Laundering); and Title 21, United States Code, Section 846 (Conspiracy to Distribute Narcotics).

**Gary Kwong Yiu CHEN, a/k/a Gary CHEN, a/k/a Jimmy, a/k/a David** (hereinafter CHEN) is a 25 year-old U.S. citizen, believed to reside in San Francisco, California. CHEN has no criminal convictions. CHEN is the associate of GEE and ELAINE LIANG. As detailed further below, CHEN was involved with money laundering (proceeds are believed to be from illegal drug trafficking) with an FBI UCE and a conspiracy to distribute illegal drugs. I believe that the facts detailed below are sufficient to demonstrate probable cause to believe that CHEN has violated the following criminal statutes: Title 18, United States Code, Section 1956(a)(1)(A) and (B) (Money Laundering); and Title 21, United States Code, Section 846 (Conspiracy to Distribute Narcotics).

**Xiu Ying Ling LIANG, a/k/a Elaine LIANG** (hereinafter ELAINE LIANG) is a 51 year-old U.S. Legal Resident, believed to reside in Cupertino, California. ELAINE LIANG's criminal history is a DUI state misdemeanor. As detailed further below, ELAINE LIANG was involved in money laundering with an FBI UCE. I believe that the facts detailed below are sufficient to demonstrate probable cause to believe that ELAINE LIANG has violated the following criminal statutes: Title 18, United States Code, Section 1956(a)(1)(A) and (B) (Money Laundering).

**Leslie YUN, a/k/a Leslie Yuncheung, a/k/a Leslie Yuong** (hereinafter YUN) is a 42 year old United States Citizen, believed to reside in Oakland, California. YUN was federally convicted on 3 counts of forgery in January of 1996. YUN is a close associate of CHOW and is a director for the Ghee Kung Tong Supreme Lodge Chinese Freemasons of the World (a/k/a CKT) in a 2012 tax filing.1   As described in further detail below, YUN was involved in conducting money laundering transactions, purchased purportedly stolen cigarettes and known to traffic marijuana. I believe that the facts detailed below are sufficient to demonstrate probable cause to believe that YUN has violated the following criminal statutes: Title 18, United States Code, Sections 1956(a)(3)(A) and (B) and 2 (Money Laundering of Funds Believed to be Proceeds of Specified Unlawful Activity); Title 18, United States Code, Sections 371, 2314, and 2315 (Conspiracy to Receive and Transport Stolen Property in Interstate Commerce); Title 18, United States Code, Sections 371, 2342 and 2344 (Conspiracy to Traffic and Trafficking in Contraband Cigarettes); and Title 21, United States Code, Section 846 (Conspiracy to Distribute Narcotics).

**Yat Wah PAU, a/k/a James PAU** (hereinafter PAU) is a 55 year-old Naturalized United States citizen, believed to reside in Oakland, California. PAU has no known criminal convictions. PAU is a director for the Ghee Kung Tong Supreme Lodge Chinese Freemasons of the World (a/k/a CKT) in a 2012 tax filing. PAU is a long time CKT member and associate of CHOW. As described in further detail below, PAU was involved in conducting money laundering transactions and purchasing purportedly stolen cigarettes. I believe that the facts detailed below are sufficient to demonstrate probable cause to believe that YUN has violated the following criminal statutes: Title 18, United States Code, Sections 1956(a)(3)(A) and (B) and 2 (Money Laundering of Funds Believed to be Proceeds of Specified Unlawful Activity); Title 18, United States Code, Sections 371, 2314, and 2315 (Conspiracy

---

1 The Ghee Kung Tong Supreme Lodge is commonly referenced as the Chee Kung Tong (CKT). The Chee Kung Tong spelling or reference is often considered the transliteration of the Ghee Kung Tong spelling. Any references in section II of this affidavit to the Ghee Kung Tong is synonymous to the Chee Kung Tong.

1   to Receive and Transport Stolen Property in Interstate Commerce); Title 18, United States Code,

2   Sections 371, 2342 and 2344 (Conspiracy to Traffic and Trafficking in Contraband Cigarettes).

3        **Brandon Jamelle JACKSON** (hereinafter BRANDON JACKSON) is a 28 year-old United

4   States citizen, believed to reside in San Francisco, California. BRANDON JACKSON has no criminal

5   convictions. BRANDON JACKSON is the son and criminal associate of KEITH JACKSON and the

6   associate of Marlon SULLIVAN. As detailed further below, BRANDON JACKSON was involved in a

7

8   murder for hire conspiracy, gun trafficking, and drug trafficking conspiracy. I believe that the facts

9   detailed below are sufficient to demonstrate probable cause to believe that BRANDON JACKSON has

10   violated the following criminal statutes: Title 21, United States Code, Section 846 (Conspiracy to

11   Distribute Narcotics); Title 18, United States Code, Section 922(a)(1) and 2 (Dealing in Firearms

12   Without a License); and Title 18, United States Code, Section 1958 (Murder for Hire).

13

14        **Marlon Darrell SULLIVAN** (hereinafter SULLIVAN) is a 29 year-old U.S. citizen, believed

15   to reside in Oakland, California. SULLIVAN works as a sports agent. SULLIVAN has no known

16   criminal convictions. SULLIVAN is an associate of KEITH JACKSON and BRANDON JACKSON.

17   As detailed further below, SULLIVAN was involved in a murder for hire conspiracy, gun trafficking,

18   drug trafficking conspiracy and the sale of fraudulent credit cards. I believe that the facts detailed below

19   are sufficient to demonstrate probable cause to believe that SULLIVAN has violated the following

20   criminal statutes: Title 21, United States Code, Section 846 (Conspiracy to Distribute Narcotics); Title

21

22   18, United States Code, Section 922(a)(1) and 2 (Dealing in Firearms Without a License); and Title 18,

23   United States Code, Section 1958 (Murder for Hire).

24        **Rinn ROEUN** (hereinafter ROEUN) is a 30 year-old United States Legal Resident, believed to

25   reside in San Francisco, California. ROEUN's criminal history includes multiple state felony arrests as

26   a juvenile with no disposition on record. As further detailed below, ROEUN was involved in selling

27   multiple firearms to an FBI UCE and conspired to commit a murder for hire for an FBI UCE. I believe

28

that the facts detailed below are sufficient to demonstrate probable cause to believe that ROEUN has

violated the following criminal statutes: Title 18, United States Code, Section 922(a)(1) and 2 (Dealing

in Firearms Without a License); and Title 18, United States Code, Section 1958 (Murder for Hire).

**Wilson Sy LIM, a/k/a Dr. Lim** (hereinafter LIM) is a 60 year-old U.S.citizen, believed to reside

in Daly City, California.  LIM has no known criminal record. LIM is an associate of SENATOR YEE

and KEITH JACKSON.  As further detailed below, LIM, SENATOR YEE and KEITH JACKSON were

involved in a conspiracy to traffic firearms.  I believe that the facts detailed below are sufficient to

demonstrate probable cause to believe that LIM has violated the following criminal statutes: Title 18,

United States Code, Sections 371, 922(a)(1) and 922(l) (Conspiracy to Deal Firearms Without a License

and to Illegally Import Firearms).

### C.    STATUTES VIOLATED

**Title 18, United States Code, Section 1956(a)(3)(A) and (B)** provides:

"Whoever, with the intent . . . to promote the carrying on of specified unlawful activity; [or] to conceal
or disguise the nature, location, source, ownership, or control of property believed to be the proceeds of
specified unlawful activity . . . conducts or attempts to conduct a financial transaction involving property
represented to be the proceeds of specified unlawful activity, or property used to conduct or facilitate
specified unlawful activity, shall be fined under this title or imprisoned for not more than 20 years, or
both.  For the purposes of this paragraph . . . the term 'represented' means any representation made by a
law enforcement officer or by another person at the direction of, or with the approval of, a Federal
official authorized to investigate or prosecute violations of this section."

**Title 18, United States Code, Section 1956(a)(1)(A) and (B)** provides:

"Whoever, knowing that the property involved in a financial transaction represents the proceeds of some
form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact
involves the proceeds of specified unlawful activity . . . with the intent to promote the carrying on of
specified unlawful activity; or . . . knowing that the transaction is designed in whole or in part . . . to
conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of
specified unlawful activity . . . shall be sentenced to a fine of not more than $500,000 or twice the value
of the property involved in the transaction, whichever is greater, or imprisonment for not more than
twenty years, or both."

///
///
///
///

15

**Title 18, United States Code, Section 371** provides:

"If two or more persons conspire . . . to commit any offense against the United States . . . and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both."

**Title 18, United States Code, Section 2314** provides:

"Whoever transports, transmits, or transfers in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud . . . shall be fined under this title or imprisoned not more than ten years, or both."

**Title 18, United States Code, Section 2315** provides:

"Whoever receives, possesses, conceals, stores, barters, sells, or disposes of any goods, wares or merchandise, securities or money of the value of $5,000 or more . . . which have crossed a State or United States boundary after being stolen, unlawfully converted, or taken, knowing the same to have been stolen, unlawfully converted, or taken . . . [s]hall be fined under this title or imprisoned not more than ten years, or both."

**Title 21, United States Code, Section 841(a)(1)** provides:

"[I]t shall be unlawful for any person knowingly or intentionally to manufacture, distribute . . . or possess with intent to manufacture, [or] distribute . . . a controlled substance" and penalties depend on type and quantities of controlled substance.

**Title 21, United States Code, Section 846** provides:

"Any person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."

**Title 18, United States Code, Section 922(a)(1)** provides:

"It shall be unlawful for any person except a licensed importer, licensed manufacturer, or licensed dealer, to engage in the business of importing, manufacturing, or dealing in firearms, or in the course of such business to ship, transport, or receive any firearm in interstate or foreign commerce" and penalties are provided pursuant to 924(a)(1)(D) for willful violations of being "fined under this title, imprisoned not more than five years, or both."

**Title 18, United States Code, Section 922(g)(1)** provides:

"It shall be unlawful for any person who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year . . . to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate commerce."

16

**Title 18, United States Code, Section 924(c)** provides:

"[A]ny person who, during and in relation to any crime of violence or drug trafficking crime . . . for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime . . . be sentenced to a term of imprisonment of not less than 5 years . . . [and] no term of imprisonment imposed on a person under this subsection shall run concurrently with any other term of imprisonment imposed on the person, including any term of imprisonment imposed for the crime of violence or drug trafficking crime during which the firearm was used, carried, or possessed."

**Title 18, United States Code, Section 2342(a)** provides:

"It shall be unlawful for any person knowingly to ship, transport, receive, possess, sell, distribute, or purchase contraband cigarettes." Contraband cigarettes are defined as "a quantity in excess of 10,000 cigarettes, which bear no evidence of the payment of applicable State or local cigarette taxes in the State or locality where such cigarettes are found, if the State or local government requires a stamp, impression, or other indication to be placed on packages or other containers of cigarettes to evidence payment of cigarette taxes, and which are in the possession of any person other than" a manufacturer or warehouse proprietor exempted from the law, a common carrier with a proper bill of lading, a person licensed and in compliance with the State, or a government employee. Section 2344 provides that "Whoever knowingly violates section 2342(a) of this title shall be fined under this title or imprisoned not more than five years, or both." I am aware that New York law requires tax stamps affixed to cigarettes sold in New York.

**Title 18, United States Code, Section 1958** provides:

"Whoever travels in or causes another . . . to travel in interstate or foreign commerce, or uses or causes another . . . to use the mail or any facility of interstate or foreign commerce, with intent that a murder be committed in violation of the laws of any State or the United States as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value, or who conspired to do so, shall be fined under this title or imprisoned not more than ten years, or both . . . ."

**Title 18, United States Code, Section 922(l)** provides:

"[I]t shall be unlawful for any person knowingly to import or bring into the United States or any possession thereof any firearm or ammunition; and it shall be unlawful for any person knowingly to receive any firearm or ammunition which has been imported or brought into the United States or any possession thereof in violation of the provisions of this chapter."

**Title 18, United States Code, Section 1343** provides:

"Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire . . . communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both." And Section 1346 provides: "For

17

the purposes of this chapter, the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services."

## II.     PROBABLE CAUSE

### A.     *SUMMARY OF INVESTIGATION*

At some point in the last five years, an undercover FBI agent (herein "UCE 4527") was introduced to a high-level member of the CKT.  As a result of this introduction, in May 2010, another undercover FBI agent (herein "UCE 4599") was introduced to target subject Raymond CHOW.  CHOW then introduced UCE 4599 to many of the target subjects, referenced in Section I of this Affidavit.

As FBI UCEs continued to infiltrate the CKT through introductions made by CHOW and NIEH, it became apparent that CHOW was in charge of a criminal element of the CKT, which will be referred to as the CHEE KUNG TONG CRIMINAL ENTERPRISE (herein CKTCE).  In particular, during a meeting with UCE 4599, while seated in a booth in a karaoke bar, CHOW whispered into UCE 4599's ear that although CHOW was no longer involved in criminal activity, CHOW knew of and approved all criminal activities within his organization.  Moreover, CHOW has described himself to UCE 4599 as a judge within his organization.  According to CHOW, when there is a dispute between the organization's members and if one member kills another member, CHOW decides if the killing was justified.  NIEH has explained to UCE 4599 that he, meaning NIEH, is also considered a leader within the organization, but that NIEH still reports to CHOW, whom NIEH described as the equivalent of a general.  On another occasion, during a discussion between CHOW and NIEH in a court authorized T-III intercept, CHOW acknowledged that the activities between UCE 4599 and officials who hold positions in the CKT (YUN and PAU) can be interpreted as organized crime and that NIEH needed to take care when involving YUN in such activity [money laundering] because of her [YUN's] financial responsibilities and ties to the CKT and CHOW's company [believed to be CHOW ENTERPRISES, LLC].  Additionally, NIEH explained to UCE 4599 that CHOW has sacrificed himself by being a target of law enforcement and that has enabled other members of his organization to conduct criminal activity "freely" because law

enforcement was focused on CHOW. From this investigation, activities of CHOW and members of the CKTCE show a pattern of racketeering activity.

During the course of multiple undercover operations, UCE 4599 was brought into a criminal relationship with many of the Targets. The purpose of this criminal relationship was for CHOW, NIEH, SIU, and CHIU to launder UCE 4599's money, purported by UCE 4599 to have been derived from illegal activities, specifically illegal gambling, bookmaking, sports betting, drugs, and outdoor marijuana grows. In further support of UCE 4599's legend, UCE 4599 portrayed himself to CHOW and others as an east coast member of La Cosa Nostra, an Italian organized crime syndicate. CHOW, as the Dragonhead of the CKT, was the supervisor of the criminal relationship with UCE 4599. In support, both NIEH and SIU and other Targets have stated to UCE 4599 that CHOW sanctioned them to engage in criminal activities with UCE 4599. Eventually, in March of 2012, UCE 4599 was inducted into the CKT at an event, and given the title of Consultant to the CKT.

Through subsequent undercover operations, UCE 4599 conveyed to NIEH his interest in laundering money with other associates of NIEH and CHOW. NIEH then introduced YUN and PAU to UCE 4599 for the purpose of laundering money for UCE 4599. UCE 4599 explained to YUN and PAU the source of this money was from outdoor marijuana grows.

From March 2011 through December 2013, CHOW, NIEH, SIU, CHIU, YUN and PAU collectively laundered $2,290,000, in purportedly illicit funds, for UCE 4599. Specifically, NIEH laundered $1,720,000, SIU laundered $160,000, CHIU laundered $170,000, YUN and PAU laundered a total of $240,000. They were paid a 10% fee for laundering the money.

As the criminal relationship continued to develop among UCE 4599, CHOW and the Targets, UCE 4599 advised that he was interested in generating income from any illegal schemes in which they are involved.

In response, NIEH, CHOW and UCE 4599 engaged in a scheme to transport stolen liquor to

19

China. It was at that time, CHOW directly introduced TINA LIANG, who is an associate of TILTON

and JANE LIANG. UCE 4599 subsequently conducted a purportedly stolen liquor transaction with

TINA LIANG, TILTON and JANE LIANG, where they paid UCEs $30,000 for purportedly stolen

liquor. Later in the investigation, it was revealed that the purportedly stolen liquor was shipped to

Vietnam in lieu of being shipped to China. CHOW and NIEH were each paid $5,000 for facilitating this

transaction.

   Subsequently, NIEH introduced MA and SO. SO owns a restaurant located in San Francisco

where many of the CKT events have been held. UCE 4599 on two occasions sold purportedly stolen

liquor to MA and SO totaling approximately $14,500. CHOW and NIEH were both paid $6,000 each

for facilitating these purportedly stolen liquor transactions. MA was paid $900 for his role.

   Through consultations with CHOW, NIEH continued to help UCE 4599 build his criminal

relationships with members of the CKTCE. In particular, NIEH, YUN and PAU expressed interest in

facilitating the sale of purportedly stolen cigarettes without proper tax stamps (contraband cigarettes) to

CKTCE associates located in New York. In New York, on three occasions, UCEs sold in total 250

master cases of cigarettes to YUN, PAU, CHAN and ZHANG, and others yet to be identified, for

$431,910.

   YUN and PAU profited $36,010 from the purportedly stolen and contraband cigarette

transactions. CHOW and NIEH received $17,000 each as part of their profits.

   NIEH has also introduced UCE 4599 to CHANTHAVONG, for the purpose of allowing UCE

4599 to assist CHANTHAVONG in a San Francisco-based marijuana trafficking operation that

CHANTHAVONG operated. After furthering the relationship with CHANTHAVONG, UCE 4599 was

introduced to CHANTHAVONG'S criminal associates LI, and NHINGSAVATH, who solicited UCE

4599's help in laundering drug proceeds from the east coast to San Francisco. UCE 4599 purported that

he and his criminal associates on the east coast would accommodate their request in exchange for a

money laundering fee. LI and NHINGSAVATH agreed, and later involved criminal associates

MASTRANGELO and others, who facilitated multiple money laundering transactions by dropping off

drug proceeds in the form of cash to FBI UCEs on the east coast.

From March 2011 to December 2013, CHANTHAVONG, LI, NHINGSAVATH,

MASTRANGELO and others with the permission of CHOW, have money laundered drug proceeds with

UCE 4599 totaling $1,048,764. Additionally, both LI and CHANTHAVONG have sold multiple

firearms illegally, as well providing as a ballistic vest to UCE 4599. LI and CHANTHAVONG have

also provided processed marijuana to UCE 4599 in exchange for cash.

In October 2012, local law enforcement conducted state search warrants at CHANTHAVONG's

residence and a warehouse associated to CHANTHAVONG. At the residence, officers and federal

agents seized 91 marijuana plants, a loaded firearm, and approximately 1.785 kilograms of cocaine (one

pressed into a brick form), among other items. At the warehouse associated to CHANTHAVONG,

officers and federal agents seized 496 marijuana plants and a press with wood form attachments which

appeared to be used as a tool to press material into a brick shape. The press and wood forms had trace

amounts of a white powdery substance that tested positive for cocaine.

Through CHOW and NIEH, UCE 4599 was also introduced to MICHAEL MEI, another member

of the CKTCE, who was involved in drug trafficking. In October 2012, local law enforcement

conducted state search warrants at a location associated to MICHAEL MEI. At this location, officers

and federal agents seized 803 marijuana plants, to include indicia from a vehicle located in the house,

among other items. The indicia included a map of Northern California with a location circled that

corresponds to 33 Woodland Avenue, Daly City, CA. MEI's insurance documents were also found in

one of the vehicles at this indoor marijuana location and MEI later discussed this location with UCE

4599.

As UCE 4599 continued to purport his interest in seeking profits from criminal activity, CHOW

21

and NIEH then introduced ELAINE LIANG who requested that UCE 4599 launder drug proceeds from the east coast to San Francisco, CA. ELAINE LIANG then introduced GEE who revealed to UCE 4599 their extensive drug network that extends to Georgia, New York, and Massachusetts. UCE 4599 purported that he and his criminal associates on the east coast would accommodate their request in exchange for a money laundering fee. ELAINE LIANG and SERGE GEE agreed and later introduced LAI, CHEN, and others, who facilitated money laundering transactions in cities located in Georgia, New Jersey and Massachusetts.

From August 2013 to December 2013, ELAINE LIANG, GEE, LAI, CHEN and others, with the support of CHOW, have successfully laundered drug proceeds with UCE 4599 totaling $1,557,085.

CHOW was paid approximately $30,000 for facilitating these money laundering operations through his support as the leader of the CKTCE.

CHOW also introduced KEITH JACKSON to UCE 4599. KEITH JACKSON is a Consultant to the CKT, similar to the position of UCE 4599 who was inducted into the CKT.

Since this introduction, KEITH JACKSON, BRANDON JACKSON and SULLIVAN have committed and conspired to commit several criminal schemes. In particular, UCE 4599 purported to KEITH JACKSON his need for a large amount of weapons to arm his purported associates who tended to marijuana grows located in northern California. KEITH JACKSON responded by stating his son, BRANDON JACKSON and his associate SULLIVAN would be able to accommodate his request. Subsequently, KEITH JACKSON, BRANDON JACKSON and SULLIVAN sold various types of firearms, and two ballistic vests, to UCE 4599 in parking lots located in San Francisco. Additionally, KEITH JACKSON, BRANDON JACKSON and SULLIVAN, have conspired to commit a purported murder for hire scheme requested by UCE 4599. On another occasion, SULLIVAN provided multiple fraudulent credit cards to UCE 4599 using a fictitious name provided by UCE 4599 to SULLIVAN. During the investigation, there have been multiple conversations with UCE 4599 about the details of the

drug operation of KEITH JACKSON, BRANDON JACKSON and SULLIVAN involving the interstate

distribution of drugs.  One particular conspiracy involved the purported sale of cocaine to KEITH

JACKSON, BRANDON JACKSON and SULLIVAN, from UCE 4599's purported drug connection on

the east coast.

The criminal relationship further developed between UCE 4599 and KEITH JACKSON,

BRANDON JACKSON, SULLIVAN.  BRANDON JACKSON then introduced one of his sources of

supply for firearms, later identified as Rinn ROEUN.

ROEUN sold multiple firearms to UCE 4599 and, during a series of conversations, told UCE

4599 he [ROEUN] was willing to commit murder for a fee at the request of UCE 4599.

In addition to his relationship with CHOW and the CKT, KEITH JACKSON is also a close

associate of, and has a long-time relationship with, SENATOR YEE.  KEITH JACKSON owns and

runs a business called "Jackson Consultancy," a San Francisco based consulting firm.  During the time

frame from at least May 2011 through the present, KEITH JACKSON has been involved in raising

campaign funds for SENATOR YEE.  This includes raising funds for SENATOR YEE's campaign

during SENATOR YEE's run in the San Francisco mayoral election held on November 8, 2011; to

retire SENATOR YEE's debt from the mayoral campaign; and for SENATOR YEE's current campaign

in the California Secretary of State election to be held in November 2014.

Starting in May 2011, and continuing for several months, KEITH JACKSON solicited UCE

4599 to make contributions to SENATOR YEE's San Francisco mayoral campaign.  These solicitations

included asking UCE 4599 for donations in excess of the $500 individual donation limit.  UCE 4599

declined to make any donations to SENATOR YEE, but introduced KEITH JACKSON and SENATOR

YEE to a purported business associate, UCE 4773, another undercover FBI agent.  KEITH JACKSON

and SENATOR YEE then solicited UCE 4773 for campaign contributions, and UCE 4773 made at least

one personal donation in the amount of $5,000 to SENATOR YEE's mayoral campaign.

After SENATOR YEE lost the November 8, 2011 election, he had at least $70,000 in debt from that campaign. The same $500 limit on individual donations applied to donations to retire that debt. After losing the election, and in anticipation of the expiration of his term as State Senator in December 2014, SENATOR YEE decided to run for election in the California Secretary of State race to be held in November 2014. In order to retire the mayoral debt before starting to raise funds for the Secretary of State campaign, beginning in early 2012 SENATOR YEE and KEITH JACKSON sought to raise money, and did raise money, in order to retire the mayoral campaign debt. This included soliciting UCE 4773 for additional donations and in the course of doing so, SENATOR YEE and KEITH JACKSON agreed that SENATOR YEE would perform certain official acts in exchange for the donations from UCE 4773.

In connection with efforts to retire the mayoral campaign debt, SENATOR YEE and KEITH JACKSON agreed that SENATOR YEE would make a telephone call to a manager with the California Department of Public Health in support of a contract under consideration with UCE 4773's purported client, and would provide an official letter of support for the client, in exchange for a $10,000 campaign donation. SENATOR YEE made the call on October 18, 2012 and provided the letter on or about January 13, 2013. On November 19, 2012, KEITH JACKSON accepted the $10,000 cash donation from UCE 4599, who was paying KEITH JACKSON and SENATOR YEE the money on behalf of UCE 4773.

In addition, over the course of 2012 and continuing to the present time, SENATOR YEE and KEITH JACKSON have raised money and campaign funds for Senator YEE's Secretary of State campaign by soliciting donations from UCE 4599 and another FBI undercover agent, UCE 4180. They agreed that in exchange for donations from UCE 4599 and UCE 4180, SENATOR YEE would perform certain official acts requested by UCE 4599 and UCE 4180.

In connection with efforts to raise funds for the Secretary of State campaign, SENATOR YEE

24

and KEITH JACKSON agreed to UCE 4599's request that SENATOR YEE provide an official State Senate proclamation honoring the CKT in exchange for a $6,800 campaign donation, the maximum individual donation amount allowed by law. SENATOR YEE arranged to provide the proclamation and one of his staff members made the official presentation of the proclamation on SENATOR YEE's behalf at a CKT anniversary celebration on March 29, 2013. On May 6, 2013, UCE 4599 provided a $5,000 check payable to "Leland Yee Secretary of State" to KEITH JACKSON; on July 11, 2013, UCE 4599 provided a second check to KEITH JACKSON, this time for $1,800, made payable to "Leland Yee Secretary of State."

Also as part of SENATOR YEE's and KEITH JACKSON's efforts to raise money for the Secretary of State race, SENATOR YEE and KEITH JACKSON agreed that in exchange for campaign donations, SENATOR YEE would introduce a donor to state legislators who had influence over pending and proposed medical marijuana legislation, an area in which the donor purportedly had significant business interests. The donor was another FBI undercover agent, UCE 4180, who was posing as a businessman involved in medical marijuana in Arizona and who wanted to expand his business interests to California. On June 20, 2013, SENATOR YEE made one such introduction and in payment for that introduction, UCE 4180 delivered $11,000 cash to SENATOR YEE and KEITH JACKSON on June 22, 2013. On August 26, 2013, SENATOR YEE introduced UCE 4180 to another legislator, and on September 17, 2013, UCE 4180 gave SENATOR YEE and JACKSON $10,000 in cash as payment for that introduction.

In a further attempt of KEITH JACKSON and SENATOR YEE to gain more money from UCE 4599, in August 2013, KEITH JACKSON told UCE 4599 that SENATOR YEE, had a contact who deals in arms trafficking. This purported arms dealer was later identified. JACKSON requested UCE 4599 to provide a campaign donation on behalf of SENATOR YEE, for SENATOR YEE to facilitate a meeting with the arms dealer with the intent of UCE 4599 to purportedly purchase a large number of

weapons to be imported through the Port of Newark, New Jersey.  During a meeting with UCE 4599,

SENATOR YEE, and KEITH JACKSON, SENATOR YEE discussed certain details of the specific

types of weapons UCE 4599 was interested in buying and importing.

It should be noted that throughout this investigation, CHOW has made several exculpatory

statements about how he strives to become legitimate and no longer participates in criminal activity.

For example, CHOW has previously discussed how he had $50,000 in his bank account that he

set aside to get his book published.  CHOW stressed that those funds were absolutely legitimate.

Further into the conversation, CHOW stated that he now promoted "grand ideas."  CHOW stated that

law enforcement was looking to put CHOW away, and that there were "snitches" out there who were

using CHOW to direct law enforcement attention onto CHOW.  CHOW said that he did not care,

because what was happening "out there" had nothing to do with him.

As another example, CHOW stated that he had a potential book deal and movie proposition

regarding his life.  CHOW stated the deal was for $3 million.  CHOW said he did not want to sign the

deal, because he wanted control of production of the story.  CHOW added that community leaders from

Sacramento asked CHOW to give lectures on the evils of alcohol and drugs, and that CHOW earned

$200 each time he gave such a lecture.

In addition, during multiple meetings with UCE 4599, CHOW has repeatedly referred to

"legitimate" business, including the possibility of publishing an autobiography and possibly producing a

movie regarding his life.

Similarly, in October of 2011, CHOW said that he was broke, but that people did not believe

him.  UCE 4599 responded that for a broke person, CHOW had a lot of nice clothes and jewelry.

CHOW explained that he did not understand why people gave him things all the time.

In February of 2012, in regards to the transportation and sale of a shipment of stolen liquor,

CHOW told UCE 4599 that he did not know that UCE 4599 did not have a liquor license.  UCE 4599

26

1  explained that he did not have a liquor license, and that the only license he had was to do whatever

2  business he wanted to.  CHOW explained he didn't want to know the details of the liquor deal and said

3  that UCE 4599 and NIEH were outlaws. CHOW asked "How am I hanging out with outlaws like this?"

4  NIEH pointed to CHOW and said "you are an outlaw too."  CHOW laughed and replied "I'm innocent, I

5
   don't have no knowledge of the crimes you commit to pay for my meal, that is very bad."  (However, it
6
7  should be noted that CHOW continued to say, "I'm still eating though, I'm hungry."  CHOW then asked

8  NIEH, "What side are you on man, are you on the prosecutor's side or something?"  NIEH explained

9  that he was in the middle.  CHOW replied "I'm good with the outlaw thing man.")

10         CHOW has also been portrayed in many Chinese newspapers as being involved in community

11  affairs and has been photographed posing with local politicians and other community leaders.  For

12
   example, in August of 2006, CHOW was photographed holding a Certificate of Honor from the San
13
   Francisco Board of Supervisors for community service of the CKT.
14

15         Nonetheless, while making these self-exculpatory statements and references to apparently

16  legitimate business activity, CHOW also frequently makes inculpatory statements confirming his

17  knowledge of and involvement in criminal activity, as further detailed below.  CHOW's involvement in

18  illegal activity is discussed in further detail below, but in sum, CHOW has repeatedly accepted

19  payments from UCE 4599 as a fee for allowing UCE 4599 to engage in money laundering with NIEH,

20
   CHIU, SIU and others, and has told UCE 4599 that while he, CHOW, does not engage in criminal
21
22  activity himself, he knows what is going on in his organization and approves of all criminal activity.

23  Using his influence and position within the CKTCE, CHOW continued to sanction introductions and

24  criminal activity between UCE 4599 and CHOW's associates and continued to receive payments from

25  UCE 4599 for his involvement in facilitating those criminal activities.  CHOW continued to introduce

26  multiple individuals to UCE 4599.  Early in the investigation, CHOW approached UCE 4599 and others

27  about schemes to illegally ship what CHOW described as "military-grade" tungsten between the United

28

States and China. CHOW also helped to arrange a deal to sell and ship purportedly stolen liquor from the United States to China.

It should also be noted that in the course of the investigation, SENATOR YEE has made exculpatory statements about how he is not interested in making money for himself, and complaining about the way UCE 4180 openly discussed how much he was willing to pay SENATOR YEE for certain official acts. In terms of the latter, SENATOR YEE periodically complained to KEITH JACKSON and others that talk like that is "pay to play," and said that he could not do that. He also added that contributions could not be linked to any items, bills, or amendments.

Despite complaining about UCE 4180's tendency to speak frankly and tie payment to performance, and threatening to cut off contact with UCE 4180, SENATOR YEE and KEITH JACKSON continued to deal with UCE 4180 and never walked away from quid pro quo requests made by UCE 4180. In fact, SENATOR YEE provided the introductions sought by UCE 4180 and accepted cash payments which UCE 4180 expressly tied to the making of the introductions.

Below I describe in detail undercover operations involving UCE 4599 and Targets identified in Section I of this Affidavit, along with others that were recorded either using body wire recorders, closed circuit television (herein "CCTV"), or via court authorized T-III intercepts. Unless otherwise noted, the facts detailed below were recorded and/or observed by UCE 4599 and/or other UCEs during conversations and interactions with CHOW, YEE, and/or their associates.

## B. *EARLY CONVERSATIONS WITH CHOW AND ASSOCIATES*

In some of the earliest meetings, CHOW discussed illegal activities and making introductions for the UCEs to commit illegal acts. CHOW stated that he could not be involved in committing any of the acts, but that he could make introductions. At the very first meeting between CHOW and UCE 4527, CHOW boasted that he could move hundreds of kilos of drugs if he wanted to, but that he did not.

On June 28, 2010, CHOW went on a chartered fishing boat with UCE 4527 and 4599 off of the North Shore of Oahu. During the boating trip, they discussed potential business. CHOW indicated that he could get "military grade" Tungsten from China for cheap. He was also interested in exporting high end alcohol (like Remy or Hennessey) to China through contacts. These offers were not followed up on by the UCEs.

On July 23, 2010, UCE 4599 had dinner with CHOW and George NIEH. CHOW and NIEH discussed what types of guns they prefer. CHOW described how he used to carry two 9mm and a .45 caliber. CHOW described that a .22 caliber is an assassin's gun, but he liked carrying something that had real power and would stop someone if you had to use it on the street. He described shootings and pistol whippings that he had done in the past.

On August 5, 2010, UCE 4599 was introduced by CHOW to Keith JACKSON and others. CHOW told UCE 4599 that JACKSON has a lot of political influence and can do "inside deals" with the City. CHOW explained that he met Keith JACKSON when JACKSON approached CHOW to try to get support for the development in the Bayview/Hunter's Point area of the City. Later that same night, CHOW asked UCE 4599 about distributing illegal diesel that CHOW stated he could get for "under market prices" from China.

On December 16, 2010, UCE 4527 talked with CHOW. UCE 4527 vouched for UCE 4599 to do business with CHOW's people, like Kevin SIU. CHOW asked about what sort of business, and UCE 4527 talked about illegal cigarette trafficking. CHOW warned against that business, since they were already doing so well. CHOW said he had turned down similar deals in the past.

On February 10, 2011, SIU and UCE 4599 met in Las Vegas, Nevada. During that meeting, SIU stated that CHOW had approved for SIU to do business with UCE 4599. SIU and UCE 4599 discussed trafficking in marijuana and cocaine. SIU said that he wanted to make it clear that CHOW had nothing to do with their discussions about drug trafficking. UCE 4599 told SIU that he better take care of

1   CHOW out of respect and SIU said "a deal is a deal." SIU said CHOW gave the okay to work with

2   UCE 4599, but that CHOW had nothing to do with any illegal activities. SIU pulled out a gun and put it

3   on the table while giving UCE 4599 a sample of cocaine to test. They discussed SIU laundering money

4   for UCE 4599, for a 10% profit.

5
        **C.   *CONVERSATIONS REGARDING THE CKT AND HST***
6

7          Through his lengthy relationship with CHOW, NIEH, SIU, CHIU, and others, UCE 4599 has

8   been exposed to many conversations regarding the conduct, organization, membership, and operation of

9   the Chee Kung Tong (CKT) and the Hop Sing Tong (HST). Almost all of those conversations were

10  recorded and are repeated throughout this memorandum. In March of 2012, UCE 4599 was also

11  inducted into the CKT as a "Consultant" to the enterprise. He was, from that point on, further entrusted

12  with conversations regarding the membership and conduct of the enterprise. UCE 4599 has also
13
    attended and recorded many CKT events, including their annual banquets. UCE 4599 also bribed
14
15  California State SENATOR LELAND YEE and KEITH JACKSON to obtain a proclamation from the

16  California Senate on behalf of the CKT. UCE 4599 was present at a CKT function when the

17  proclamation was presented by one of SENATOR YEE's staff members.

18         CHOW has described himself, and been described by others, as the Dragonhead of the CKT. He

19  uses the numeric title of "489." George NIEH has described himself as a soldier in the organization, but

20  has also stated that he will not take an officer's role due to his active criminal activities. James PAU
21
    described his position within the CKT as an organizer, and the number "415." Leslie YUN also
22
23  described herself, and was described by others, as a bookkeeper for the CKT. Kongphet "Joe"

24  CHANTHAVONG described himself as the Head of Security. Andy LI described himself, and was

25  described by others, as the head of enforcement for the CKT. Ming MA has described himself, and gave

26  UCE 4599 a business card, showing his position as a soldier in the CKT. KEITH JACKSON was sworn

27  into the CKT as a Consultant, the same position given to UCE 4599.

28
                                                30

1    On March 19, 2011, the day following an annual CKT banquet, CHOW described to UCE 4599

2    that the placing of a black lion outside of the banquet restaurant was to send a message of intimidation to

3    all other organizations that CHOW's organization was the oldest and strongest.

4    On April 13, 2011, NIEH described his history and CHOW's history as gang leaders. NIEH said

5
6    he was in charge of the Wah Ching gang and CHOW was in charge of the Hop Sing gang. NIEH said

7    they used to be enemies, but banded together instead. CHOW described that he had nothing to prove as

8    a tough guy any longer, but that if anything happened to him, the person who did it would pay a

9    tremendous price and their life would disappear. CHOW said he always had a group to shadow him for

10   protection. At one point while music was loud in a club, CHOW told UCE 4599 that while he, CHOW,

11   does not engage in criminal activity himself, he knows what is going on in his organization and approves

12
     of all activity.
13

14   On May 6, 2011, NIEH told UCE 4599 that he and CHOW believed that SIU was a rat and was

15   cooperating with the police. NIEH stated that if they thought someone was a rat they would kill them or

16   chop off their tail.

17   On May 25, 2011, UCE 4599 went to dinner with CHOW, NIEH and KEITH JACKSON.

18   CHOW spoke about his position as the Dragonhead and explained that if one of his members had an

19   argument and killed another member, CHOW would act as a judge to see if the killing was justified, and

20   then make a ruling. During dinner, KEITH JACKSON requested that UCE 4599 contribute $500 to

21
22   SENATOR YEE's campaign for Mayor of San Francisco. CHOW explained that SENATOR YEE only

23   realizes now the influence CHOW has on the Chinese community. CHOW later stated that he helped

24   SENATOR YEE enough already. NIEH explained that SENATOR YEE made a big mistake by not

25   supporting CHOW on one occasion.

26   On September 22, 2011, NIEH described CHOW as a member of the Triad and that he had to do

27   everything "under the table." NIEH described himself as a gangster.

28
                                                       31

On October 19, 2011, CHOW stated that he had not felt threatened in a long time.  CHOW said he did feel threatened about five years earlier.  CHOW said that the last time someone posed a threat to CHOW, CHOW "dropped him."  CHOW also described his loyalty to his Dai Lo earlier in his career and compared CHANTHAVONG's current loyalty to CHOW.  I am aware that "Dai Lo" is a term meaning "Big Brother."  In the context of Asian organized crime, it is a term indicating a higher rank in the organization, or a boss, and is a term of respect.

On November 17, 2011, NIEH described to UCE 4599 a run in at the HST headquarters between CHOW's people and people who supported a rival Hop Sing Tong member.  NIEH told UCE 4599 that NIEH and CHANTHAVONG were positioned outside of the headquarters and carrying firearms to protect CHOW.  When they saw SFPD officers at the event, they then hid their guns across the street in a restaurant bathroom.  Later that night, CHOW described to UCE 4599 the animosity between himself and the rival and that CHOW was removing his protection from that rival so that the rival could be killed by anyone.  CHOW said that he received a call after the HST meeting from a supposed follower of his rival, who told CHOW that his rival was not the real Dai Lo; CHOW was the real Dai Lo.

On January 18, 2012, while traveling in Las Vegas, NIEH told UCE 4599 that he stabbed a man in Hong Kong in order to gain admission into the gang.  NIEH also told UCE 4599 that CHOW was considering leaving the HST in an effort to determine who CHOW's real allies were.  NIEH told UCE 4599 that he would be sworn into the CKT on March 16, 2012, at the annual CKT dinner event.  NIEH said that he and CHOW would show up to the event late to avoid any potential encounters with law enforcement.  NIEH told UCE 4599 that CHOW had asked for a favor – CHOW wanted to know if UCE 4599 would ask UCE 4773 to ask SENATOR YEE to assist in removing CHOW's ankle monitor.  NIEH described the history of the Chinese Tongs.

On January 25, 2012, CHOW discussed how the U.S. Department of Justice is waiting for him to slip up so that they can charge him, but that it will not work because CHOW knows what they are doing.

CHANTHAVONG later talked to UCE 4599 and explained that Andrew LI, a/k/a Andy LI, is a little higher than CHANTHAVONG in the CKT. CHANTHAVONG described CHOW as the boss of LI and CHANTHAVONG. CHANTHAVONG said he had five people hand-picked under him. CHANTHAVONG said that when CHOW was elected Dragonhead, he made CHANTHAVONG his personal security. Later that night, CHOW described to UCE 4599 that, although he was not involved in any criminal activity, he had some pretty rough people in the city if he needed them. CHOW described that he was aware of what was happening in the streets and if his members have problems with each other, then CHOW mediates. CHOW said members come to him to discuss his opinions on how to handle situations. In a discussion with LI, LI told UCE 4599 that he came back to the Bay Area to handle CHOW's problems with his rival in the HST. LI said that he would pretend that there was a falling out between LI and CHOW so that he could get close to CHOW's rival and then "get rid of the bugs."

On February 16, 2012, CHOW discussed with UCE 4599 that CKT members from New York would be attending the March 2012 CKT event in San Francisco. CHOW said the New York members were asking CHOW for promotions. CHOW said each had to explain to CHOW what they had done in the past three years that would get them a promotion. CHOW said the New York members needed to "earn their stripes." CHOW explained that the CKT in San Francisco is the original CKT in the United States.

On March 16, 2012, UCE 4599 attended an annual event sponsored by the CKT. During that event, UCE 4599 and KEITH JACKSON were both inducted into the CKT as Consultants. CHOW presented UCE 4599 with a certificate signifying his role in the CKT as Consultant. CHANTHAVONG was there and said that "when Old Man [CHOW] says you are family, then you are family." CHANTHAVONG said that if UCE 4599 ever needed anything, CHANTHAVONG would have his "guys take care of it." CHANTHAVONG described that he had five guys who were a "Black

33

Operations Team" that swore loyalty to CHANTHAVONG only but that CHANTHAVONG's loyalty is to CHOW. CHANTHAVONG described getting into fights and talked about selling guns to UCE 4599. CHANTHAVONG said it would be hard to get UCE 4599 a "clean" gun and he didn't want to supply one with "four or five bodies on it."

On April 19, 2012, NIEH described that they should stop working on money laundering deals with Alan CHIU since CHIU was dropping out of the CKT. NIEH said that "if we are not together then I don't trust you." NIEH said he was seeking CHOW's authority to prevent CHIU from working with UCE 4599 since CHIU would not be CKT any longer.

On April 20, 2012, CHOW described to UCE 4599 that if he ever got "hit," there would be a lot of people to avenge his death.

On May 3, 2012, NIEH, James PAU and Leslie YUN described that they needed CHOW's authorization to work with UCE 4599 on laundering money. PAU described how he had left the CKT and then re-joined the organization after 10 years.

On May 6, 2012, CHOW and NIEH talked with a recording device in NIEH's vehicle, authorized by Court Order. CHOW described the need for YUN and PAU to be very careful when working with UCE 4599. CHOW described that everyone close to CHOW had an official position in the CKT. CHOW described that even if CHOW didn't do anything, he and the CKT would be stuck at the end and dragged into it because of the CKT relationship. CHOW said that was why he didn't want the officials close to him doing any of this stuff. CHOW said he was afraid of the CKT being tagged as an "underworld society" and "participating in organized crime." CHOW said whenever members of the CKT get together they would be "participating in organized crime." CHOW said that's all he was worried about, but, of course, he wanted to make money. CHOW said he didn't want the CKT involved. NIEH pointed out that SIU and CHIU were already working on it [laundering money with UCE 4599]. CHOW said that those two didn't hold important positions, but YUN is in charge of the CKT bank

accounts and holds the books. CHOW said law enforcement would try to press YUN to get to CHOW. CHOW said people who "rat" on him would be safe in the end and that CHIU was someone who would "rat" anyone out. CHOW said that if he got ratted out, he would claim that he had only introduced the relationship, and that he did not know what they were doing. CHOW said even if he knew what they were doing, he never witnessed the transactions. CHOW said he would claim that he knew those people talked to each other, that's all. CHOW said that is why CHOW says not to tell CHOW anything when giving a report of what is happening. CHOW did not want to know anything because he would not be guilty if he did not know anything. NIEH said he told UCE 4599 not to say too much on the phone also. CHOW said his associates made that mistake by using phones and that was what got them in trouble.

On July 19, 2012, NIEH and UCE 4599 talked about the CKT. NIEH said because he had a criminal history, he couldn't take a position with the CKT or else law enforcement could classify the CKT as a "mafia" organization. UCE 4599 asked why that didn't keep CHOW from taking an official position. NIEH said that if NIEH would stop committing crimes then he could take a position. NIEH said the Hung Moon is a criminal organization in China, but not in the United States. UCE 4599 said it walks a fine line between legitimate and illegitimate and NIEH agreed.

On July 26, 2012, UCE 4599 talked to NIEH and said whatever crimes he committed with the CKT, he would take care of CHOW and NIEH. NIEH told UCE 4599 to be careful talking with CHOW openly about criminal activities because CHOW was afraid of being overheard by law enforcement. NIEH said CHOW did not know about the stolen cigarette deals with YUN. UCE 4599 disagreed that CHOW did not know since NIEH had previously told CHOW that UCE 4599 "rips off trucks." UCE 4599 agreed to try to keep CHOW out of conversations. NIEH said that CHOW serves a purpose by attracting attention from law enforcement and allowing everyone else to commit crimes. NIEH said he pays half of what he makes to CHOW.

On September 7, 2012, UCE 4599 talked with NIEH about a disagreement between CHOW and

1   YUN over a CKT event. YUN thought CHOW needed to treat people better. YUN also accused NIEH

2   of only hanging around CHOW, but not helping to run the CKT. NIEH explained how hard it was to

3   hang out with CHOW and that NIEH could take a bullet at any time protecting CHOW. NIEH told UCE

4   4599 that CHOW had summoned "gangsters" of the CKT to help run the event.

5
6        On September 8, 2012, UCE 4599 attended the CKT event in a restaurant in San Francisco

7   Chinatown. At the dinner, UCE 4599 saw CHOW, NIEH, YUN, MA, PAU, MEI, and SIU. UCE 4599

8   sat at a table with KEITH JACKSON and his son, BRANDON JACKSON. UCE 4599 agreed to meet

9   with the JACKSONS regarding sale and transportation of narcotics.

10       On September 20, 2012, UCE 4599 talked to NIEH about whether another individual was a

11  Triad member. The other person was interested in paying UCE 4599 to smuggle bulk cash from Canada

12  into the United States. NIEH said he could "smell a Triad." NIEH showed UCE 4599 the Triad hand

13  shake. UCE 4599 said he had seen CHOW do that same hand shake with certain people. NIEH

14  confirmed that CHOW's Triad number was "489" and that all Triad ranks have a corresponding number.

15  As UCE 4599 was negotiating with the other person, NIEH explained that the other person could trust

16
17  UCE 4599 to transport large sums of money because "our Tong [the CKT] will be the middle person to

18  watch out for both sides," meaning that the CKT would insure the transaction. NIEH said about NIEH

19  and UCE 4599, "we know each other because of the Tong."

20       On January 10, 2013, PAU described the following: PAU said CHOW's position as Dragonhead

21  was a lifetime position. PAU said CHOW would work on his book and take care of "family business

22  and community business." PAU said "we do all the work for him." PAU explained it was CHOW's

23  responsibility to support his people when they conducted illegal business. UCE 4599 described how in a

24  prior cigarette deal, UCE 4599 and his people could have easily robbed the people buying the cigarettes.

25  PAU said his associates trusted UCE 4599 because his associates trusted CHOW. PAU said "they trust

26  Dai Lo, that's why he's worth so much, that's why he don't have to do nothing." PAU told the UCE he

27
28

and CHOW were recruited into the HST together. PAU explained everyone within the HST had a role and responsibility within their organization. PAU talked about the importance of having a good Dai Lo. PAU and CHOW's original Dai Lo within the HST allowed CHOW and PAU to engage in as much criminal activity as they could handle. When they were successful, they were promoted and were given a "crew." PAU talked about CHOW's rise to power as the Dragonhead of the CKT. PAU told the UCE that CHOW's predecessor as the head of the CKT, Allen Leung, was murdered and CHOW stepped up to be the new leader of the CKT. UCE 4599 told PAU from what he heard on the street, Leung deserved to be murdered. PAU smiled and said "no comment." PAU showed UCE-4599 the official handshake for members of Triad Societies. PAU explained known members of Triad Societies in Hong Kong could be imprisoned for up to three years because of their affiliation with the Triad. PAU told the UCE, CHOW's official number within the Triad was "489." PAU explained his number within the Triad was "415". PAU demonstrated the hand sign for "415" and explained his duties within the Triad were focused on planning and gathering resources. For example, if CHOW asked for the assistance of 30 soldiers within the CKT, PAU would be responsible for recruiting the help needed for the operation. An individual classified as number "49" within the Triad was considered an ordinary or basic member. PAU stated that he believed the FBI had opened many organized crime cases against Triad members over the years. Since that time, many secrets of the Triad Societies have been revealed. PAU explained there are a legitimate side and an illegitimate side of the CKT. The legitimate side of the CKT focused on serving the Chinese community and its members. The illegitimate side of the CKT focused on illegal activities that made the CKT and its members money. PAU believed Italian organized crime families only had an illegitimate side.

On January 19, 2013, NIEH and CHOW had a telephone call that was intercepted pursuant to Court Order. During the call, CHOW referenced giving others, including CHIU, directions and kicking people out of the "Association," demonstrating CHOW's control over others. They also discussed a

recent trip that NIEH took to Las Vegas where he met with an associate of UCE 4599, another UCE, who posed as a member of the entertainment industry who also laundered money for UCE 4599.

On January 19, 2013, NIEH had a conversation in his car with another person, intercepted pursuant to Court Order. During the conversation, NIEH related that CHOW was upset about management issues in both the CKT and HST.

On March 29, 2013, UCE 4599 attended an annual CKT dinner event. Present at the event were CHOW, YUN, LI, Albert NHINGSAVATH, NIEH, CHANTHAVONG, KEITH JACKSON, Michael MEI, PAU, BRANDON JACKSON, and Marlon SULLIVAN. A representative for SENATOR YEE attended and presented a Senate proclamation to recognize the CKT. CHANTHAVONG told UCE 4599 that LI was the new "enforcer" for the CKT. LI discussed different ways to kill people and described that he had a crew of people. LI discussed that CHOW had taught him to keep people you wanted to kill close to you. CHANTHAVONG told UCE 4599 that if he ever needed someone taken care of, that CHANTHAVONG had "niggas that can take you out from 500-1000 yards."

On April 17, 2013, CHOW discussed with NIEH and UCE 4599 how people used to be able to get away with a lot more crimes because law enforcement did not have the same sophisticated techniques as they have now. CHOW explained that there were a lot of smaller criminal crews in the Bay Area with their own leaders. CHOW described that he was not the leader of these smaller crews, but when CHOW "calls them out" they all come out to support CHOW. CHOW said "if anyone fucks with me, they are done for." CHOW told UCE 4599 that if UCE 4599 had any issues with any of CHOW's associates, UCE 4599 should let CHOW know.

On July 18, 2013, UCE 4599 met with YUN and PAU in Flushing, New York. PAU reiterated that his position in the CKT was "415," the "white paper fan." PAU said that YUN was the bookkeeper for the Tong. PAU described that NIEH and CHANTHAVONG were responsible to protect CHOW. LI was "426" within the Tong, which made him a fighter, and made the shape of a gun with his hand. PAU

said that he, PAU, would be responsible for making the call on a hit and LI would be responsible for carrying it out. PAU said that CHOW encouraged them to grow their illegal business by working with cultures outside of the Chinese community. PAU said that LI works directly with CHOW.

On August 11, 2013, NIEH and UCE 4599 discussed doing business with the 14K Triad. NIEH told UCE 4599 to be careful and said the 14K and the CKT were very similar in the sense that they were both Triad organizations. NIEH further described that he told CHOW about every illegal business opportunity that UCE 4599 had conducted with NIEH. NIEH said CHOW wanted to know and engaged by making calls on behalf of UCE 4599. UCE 4599 said that CHOW, as Dragonhead, needed to know what was going on, but be protected from law enforcement. NIEH said "exactly, clean his image."

## D. CRIMINAL ACTS COMMITTED BY THE TARGETS

In late February 2011, both SIU and NIEH discussed laundering money for UCE 4599, for 10% profit. UCE 4599 described to SIU and to NIEH that his money on the West Coast came from illegal gambling and from marijuana trafficking.

On February 24, 2011, UCE 4599 had dinner with CHOW, SIU, and NIEH. SIU picked UCE 4599 up and told UCE 4599 that he was setting up a fictitious Limited Liability Company (LLC) through which he could launder UCE 4599's money, up to $50,000 per month. SIU also volunteered to make collections of money for UCE 4599. During dinner, at a point, SIU and CHOW got up to go to the bathroom, leaving NIEH and UCE 4599 at the table. NIEH told UCE 4599 that, if they had opportunities to work together, that would help out CHOW. Later, at a bar, NIEH told UCE 4599 that NIEH would be willing to launder money for UCE 4599. NIEH said that CHOW gave NIEH instructions to work with UCE 4599. NIEH said he would take care of CHOW and kick some of the profits from laundering money up to CHOW.

During a dinner banquet for the CKT on March 18, 2011, NIEH said that he would kick up a portion of his fees for money laundering to CHOW, because CHOW was the "Big Brother" and had to

be taken care of. UCE 4599 told NIEH that he had an envelope for CHOW for giving him the opportunity to work together. Immediately following that dinner, UCE 4599 gave an envelope with $1000 cash to CHOW and told CHOW that it was for the opportunity to work with NIEH and SIU. CHOW took the envelope and hugged UCE 4599 and told him that he loved him. CHOW said that all of his brothers would take a bullet for CHOW. UCE 4599 told CHOW that he would take a bullet for CHOW as well.

On March 19, 2011, UCE 4599 conducted a reverse money laundering deal with both NIEH and SIU for $20,000 each. A reverse money laundering deal is a phrase referring to the targets "laundering" money, that is conducting a financial transaction with funds that a UCE represents to the targets is proceeds of specified unlawful activity – here, gambling and narcotics trafficking – with the intent to conceal or disguise the true nature, source and ownership of the funds and/or to promote the carrying on of the underlying specified criminal activity. Such an act violates Title 18 United States Code, Section 1956(a)(3)(A) and (B).

On March 19, 2011, each NIEH and SIU were paid $2,000 for conducting the transactions (10% of the amount laundered). UCE 4599 gave NIEH $2,000 in cash as a fee, and then gave NIEH $20,000 more in cash to be laundered. In exchange, NIEH wrote a personal check made payable to a fictitious business account for UCE 4599 in the amount of $20,000 and postdated the check. The check was written on an account at East West Bank, a financial institution under Title 18, United States Code, Section 1956(c)(6). NIEH told UCE 4599 that he would set up a fictitious company to conduct future money laundering transactions. Separately on that same date, UCE 4599 met with SIU. UCE 4599 gave SIU $2,000 in cash as payment. UCE 4599 then gave SIU $20,000 in cash and an extra $400 cash to cover SIU having to set up a fictitious company. SIU explained that he would do a series of deposits with the cash, and then return UCE 4599's money within five days. On March 25, 2011, the check from NIEH was successfully deposited into UCE 4599's fictitious account and on March 28, 2011, $20,000

was wire transferred into UCE 4599's fictitious account from an account in the name of Dynamic

Investment Consultant Company. The sole proprietor of Dynamic Investment Consultant Company is

SIU.

On March 29, 2011, UCE 4599 discussed money laundering with NIEH and NIEH encouraged

UCE 4599 to keep giving CHOW money as tribute for allowing them to work together. NIEH said he

also would kick money up to CHOW as things progressed and that CHOW knew what the money was

for.

On April 12, 2011, UCE 4599 conducted a reverse money laundering deal with SIU for $40,000

and paid SIU $4,000 for conducting the transaction. On April 12, 2011, UCE 4599 paid SIU $44,000 in

cash. On April 25, 2011, SIU sent a $40,000 wire transfer from a Bank of America account for a

fictitious LLC set up by SIU – Dynamic Investments – to UCE 4599's fictitious business account. **I

believe this demonstrates probable cause for a violation of Title 18, United States Code, Section

1956(a)(3)(A) and (B) by SIU.**

On April 13, 2011, UCE 4599 conducted a reverse money laundering deal with NIEH for

$40,000 and paid NIEH $4,000 for conducting the transaction. NIEH told UCE 4599 that NIEH had set

up a fictitious company for the purpose of laundering UCE 4599's money and that had cost him $495.

UCE 4599 gave NIEH another $500 cash to cover the expense. NIEH told UCE 4599 that the company

he set up was called G&S Consulting Company. NIEH wrote three separate checks to UCE 4599's

fictitious company, two for $15,000 and one for $10,000. All three checks were from an account with

East West Bank. On April 20, 2011, the three checks were deposited into the account of UCE 4599's

fictitious bank account and cleared. **I believe this demonstrates probable cause for a violation of

Title 18, United States Code, Section 1956(a)(3)(A) and (B) by NIEH.**

On May 4, 2011, UCE 4599 conducted a reverse money laundering deal with NIEH for $60,000

and paid NIEH $6,000 for conducting the transaction.

On May 25, 2011, UCE 4599 paid CHOW $1,000 for allowing him to work with NIEH and SIU. Specifically, UCE 4599 said that things were good between NIEH and UCE 4599 and handed CHOW a white envelope with cash. CHOW immediately placed the envelope in the pocket of his sport coat, then told UCE 4599, "no no no, you guys don't have to do that." CHOW then hugged UCE 4599. UCE 4599 repeated that everything was good. CHOW asked, "what do you guys have going? It must be something bad." CHOW looked at NIEH; NIEH nodded affirmatively.

On May 26, 2011, UCE 4599 conducted a reverse money laundering deal with NIEH for $110,000 and paid NIEH $11,000 for conducting the transaction. On the same date, UCE 4599 conducted a reverse money laundering deal with SIU for $50,000 and paid SIU $5,000 for conducting the transaction.

On June 16, 2011, UCE 4599 conducted a reverse money laundering deal with NIEH for $110,000 and paid NIEH $11,000 for conducting the transaction. On the same date, UCE 4599 conducted a reverse money laundering deal with SIU for $60,000 and paid SIU $6,000 for conducting the transaction.

On July 14, 2011, UCE 4599 conducted a reverse money laundering deal with NIEH for $120,000 and paid NIEH $12,000 for conducting the transaction. UCE 4599 reiterated that the source of the money was gambling and marijuana trafficking. UCE 4599 gave NIEH $132,000 in cash. NIEH counted the money and UCE 4599 stated that $12,000 was the fee for laundering. NIEH provided UCE 4599 with four postdated $30,000 checks made out to UCE 4599's fictitious business account. Two of the checks were from a Bank of America account and did not have a name of an account holder. Two of the checks were from an East West Bank account, in the name of George NIEH and another person. On July 22, 2011, checks provided to UCE 4599 by NIEH were deposited into UCE 4599's fictitious business account and subsequently cleared for deposit. Following the transaction, UCE paid CHOW $1,000 for allowing him to work with NIEH. UCE 4599 gave CHOW an envelope containing $1,000 in

cash. CHOW immediately said "no, no, no," but opened his sports coat to reveal an inside pocket. UCE 4599 placed the envelope in the inside pocket of CHOW's sports coat. CHOW then hugged UCE 4599. **I believe this demonstrates probable cause for a violation of Title 18, United States Code, Sections 1956(a)(3)(A) and (B) and 2 by NIEH and CHOW.**

Also on July 14, 2011, NIEH told UCE 4599 that CHOW preferred that UCE 4599 work with Alan CHIU to conduct future deals, not with SIU any longer, as they were concerned that SIU was a "rat." UCE 4599 met with CHIU and described that his money comes from gambling and marijuana transactions. CHIU agreed to launder money for UCE 4599.

On August 1, 2011, UCE 4599 conducted a reverse money laundering deal with CHIU for $30,000 and paid CHIU $3,000 for conducting the transaction. UCE 4599 provided CHIU with $33,000 cash and advised CHIU that $3,000 was CHIU's fee for laundering the money. CHIU wrote out four checks totaling $30,000 from a Bank of the West account held by Alan CHIU and one other person to UCE 4599's fictitious business account. On the same date, UCE 4599 conducted a reverse money laundering deal with NIEH for $100,000 and paid NIEH $10,000 for conducting the transaction. On the same date, UCE 4599 paid CHOW $2,000 for allowing him to work with CHOW's people. CHOW stated "no, no, no" but took the envelope of cash and placed it in his sports jacket pocket. On August 5, 2011, three of the checks written by CHIU were deposited into UCE 4599's fictitious business account and subsequently cleared for deposit. On August 17, 2011, the last check from CHIU for $6,000 was deposited and subsequently cleared. **I believe this demonstrates probable cause for a violation of Title 18, United States Code, Section 1956(a)(3)(A) and (B) and 2 by CHIU and CHOW.**

On September 22, 2011, UCE 4599 conducted reverse money laundering deals with NIEH and CHIU. The deal with NIEH was for $120,000 and UCE 4599 paid NIEH $12,000 for conducting the transaction. The deal with CHIU was for $60,000 and UCE 4599 paid CHIU $6,000 for the transaction. On the same date, UCE 4599 paid CHOW $2,000 for allowing him to work with NIEH and CHIU.

UCE 4599 provided CHOW with an envelope that contained $2,000.  CHOW placed the cash on the inside pocket of his sports coat and thanked UCE 4599.

On October 19, 2011, UCE 4599 conducted reverse money laundering deals with NIEH and CHIU.  The deal with NIEH was for $120,000 and UCE 4599 paid NIEH $12,000 for conducting the transaction.  The deal with CHIU was for $40,000 and UCE 4599 paid CHIU $4,000 for the transaction.

On November 17, 2011, UCE 4599 conducted a reverse money laundering deal with NIEH for $80,000 and paid NIEH $8,000 for conducting the transaction.  On the same date, UCE 4599 paid CHOW $2,000 for allowing UCE 4599 to work with NIEH and CHIU.  UCE 4599 handed CHOW an envelope containing $2,000.  CHOW put the money on the inside pocket of his coat.  UCE 4599 explained everything was going well for UCE 4599 and NIEH, and thanked CHOW.  CHOW hugged UCE 4599.  CHOW then said that NIEH was a really loyal brother.

On December 13, 2011, UCE conducted reverse money laundering deals with NIEH and CHIU.  The deal with NIEH was for $80,000 and UCE 4599 paid NIEH $8,000 for conducting the transaction.  The deal with CHIU was for $20,000 and UCE 4599 paid CHIU $2,000 for conducting the transaction.  On the same date, UCE 4599 paid CHOW $2,000 for allowing UCE 4599 to work with NIEH and CHIU.  UCE 4599 handed a white envelope containing $2,000 to CHOW and thanked CHOW for the opportunity to work with NIEH and CHIU.  During dinner, CHOW inquired about UCE 4599's ability to get large amounts of liquor, referring to UCE 4599 previously stating that he could get liquor cheap as it was stolen.  CHOW had a call with an unknown individual and asked if that other person wanted a container of Hennessey.

On January 23, 2012, UCE 4599 discussed CHOW setting up buyers of purportedly stolen alcohol with NIEH and then with CHOW.  NIEH said that CHOW had made the introductions.  CHOW explained that Tina [later identified as Tina LIANG] was lining up buyers in China.

On January 25, 2012, UCE 4599 conducted a reverse money laundering deal with NIEH for $70,000 and paid NIEH $7,000 for conducting the transaction. UCE 4599 discussed the potential liquor deal with NIEH. NIEH said CHOW wanted to know if UCE 4599 had given a quote for the liquor to TINA LIANG. UCE 4599 explained that the liquor was "hot," meaning stolen. NIEH said CHOW did not want any money from the liquor deal. UCE 4599 said CHOW always says that until he gets the money. NIEH laughed and said that when CHOW sees the money, it is different. NIEH and UCE 4599 went to examine a warehouse where CHANTHAVONG was getting ready to set up a marijuana grow. On the same date, UCE 4599 paid CHOW $2,000 for allowing UCE 4599 to work with NIEH and others. During a car ride to the Starlight Room, a nightclub in San Francisco, with CHOW and NIEH, UCE 4599 gave CHOW an envelope containing $2,000. UCE 4599 told CHOW that NIEH and UCE 4599 had a good year and thanked CHOW for the opportunity to work with NIEH. CHOW said thank you and that he knew NIEH and UCE 4599 had a good year. CHOW jokingly advised the UCE that NIEH is trouble maker. NIEH explained he was a "silencer" and he doesn't talk about business. UCE 4599 concurred and explained he is loyal to NIEH and CHOW and thanked CHOW again for the opportunity to work with NIEH. CHOW said he loved the UCE.

On February 2, 2012, CHOW, NIEH and UCE 4599 met for lunch. UCE 4599 told CHOW he had talked to Jane LIANG about selling purportedly stolen liquor. UCE 4599 expressed displeasure with how Jane LIANG negotiated. CHOW told UCE 4599 he should talk with Jane LIANG because Tina LIANG was in China and wanted Jane LIANG to follow up. UCE 4599 said he was not a liquor store and that they needed to have the money up front. NIEH said the LIANGs should know better than that, and if they wanted to get liquor legally, they should go to the liquor store. CHOW said "I don't need to know all this, you guys trouble, nothing but trouble makers." UCE 4599 said he would try to keep CHOW out of the deal as much as possible. CHOW said Tina LIANG needed to know the price since she was setting up buyers in China. CHOW told UCE 4599 he didn't know UCE 4599 didn't have

a liquor license and laughed. UCE 4599 said the only license he needed was to do what he wanted.

CHOW said he didn't want to know details and that UCE 4599 and NIEH were outlaws. NIEH said to

CHOW "you are an outlaw too." CHOW said "I'm innocent. I don't have no knowledge of the crimes

you commit to pay for my meal, that is very bad. But I'm still eating though, I'm hungry." CHOW said

to NIEH "are you on the prosecutor's side or something?" CHOW said "I'm good with the outlaw thing

man."

On February 6, 2012, UCE 4599 and NIEH met with TINA LIANG. UCE 4599 told Tina

LIANG that the liquor he had "fell off a truck," meaning it was stolen. TINA LIANG said she

understood. UCE 4599 said he could sell it for $100 per bottle, including his costs for transporting it to

California from New Jersey. TINA LIANG asked what other goods UCE 4599 could get. UCE 4599

told her it depended on what "fell off the truck." TINA LIANG said she understood. After they left,

JANE LIANG called to discuss the name of the liquor and the size of the bottle. UCE 4599 said to

NIEH that they would all make money off of the liquor deal. NIEH said that if CHOW didn't want a

share, NIEH would take it. UCE 4599 said CHOW says he doesn't want a share until it comes time to

pay and that CHOW allowed him to do the deal by making introductions. UCE 4599 said CHOW

pretends that he doesn't know the liquor is stolen. NIEH said he told CHOW several times that the

liquor was stolen, including once in front of UCE 4599.

On February 12, 2012, NIEH and CHOW were intercepted, pursuant to Court Order, talking in

NIEH's vehicle. NIEH said he wanted to test if UCE 4599 was a "snitch." CHOW said NIEH wouldn't

be able to tell and that if UCE 4599 was a snitch, he was a very good one. CHOW said if they drove

UCE 4599 away, they would just make less money. NIEH said that UCE 4599 was interested in doing

business with LI and CHANTHAVONG. CHOW said that if UCE 4599 thought he could set a bait

through LI to catch CHOW, CHOW would isolate himself from UCE 4599's contacts with LI and

CHANTHAVONG and let them deal with themselves. CHOW said he did not want to know what they did and he could claim that he was not in that business.

On February 13, 2012, UCE 4599 conducted reverse money laundering deals with NIEH and CHIU. The deal with NIEH was for $60,000 and UCE 4599 paid NIEH $6,000 for conducting the transaction. The deal with CHIU was for $20,000 and UCE 4599 paid CHIU $2,000.

On February 14, 2012, NIEH assisted UCE 4599 in purchasing 4 pounds of marijuana from Kongphet CHANTAVONG for $5,000. CHANTHAVONG was introduced to UCE 4599 as a member of the CKT by CHOW and NIEH. **I believe this demonstrates probable cause for a violation of Title 21, United States Code, Sections 841 and 846 by NIEH and CHANTHAVONG.**

On February 16, 2012, NIEH and CHOW were intercepted talking about the liquor deal and CHOW advised NIEH how to steer the negotiations.

On February 16, 2012, UCE 4599 paid CHOW $2,000 for allowing him to work with his people. UCE 4599 presented CHOW with an envelope containing $2,000. UCE 4599 explained they had a good week with the outcome of the Super Bowl. CHOW stated he would not argue with UCE 4599 and said he loved UCE 4599. UCE 4599 told CHOW he could no longer get 100 cases of the liquor for Tina LIANG because he couldn't "sit on" it, and now it would be 50 cases of liquor. They discussed negotiating the deal with Tina and Jane LIANG.

On March 5, 2012, UCE 4599 and NIEH met with TINA LIANG to negotiate the sale of 50 cases of Hennessey XO. TINA LIANG stated she talked with CHOW on several occasions about the deal. TINA LIANG said she was concerned that the alcohol would be counterfeit, but that CHOW reassured her that the alcohol was not counterfeit and that UCE 4599 could be trusted. TINA LIANG then asked UCE 4599 if he could help her with bulk cash smuggling from New York to San Francisco.

On March 9, 2012, UCE 4599 sold purportedly stolen liquor to TINA LIANG, JANE LIANG, and Brian TILTON. The deal was set up by NIEH and CHOW. CHOW demonstrated that he believed

47

the liquor was stolen by talking to NIEH and scolding NIEH for talking about it over the phone when NIEH described it as liquor from the black market. The deal was 50 cases of Hennessey XO, purportedly stolen in New Jersey, and then transported to California, for $30,000 cash. TILTON assisted by paying the money to UCE 4599 and by testing the Hennessey XO to make sure that it was not counterfeit. On March 13, 2012, UCE 4599 gave CHOW $5,000 in cash as a payment for assisting in the liquor deal. They discussed TINA LIANG and her businesses. **I believe this demonstrates probable cause for a violation of Title 18, United States Code, Sections 371, 2314, 2315 and 2 by Tina LIANG, Jane LIANG, Brian TILTON, NIEH and CHOW.**

On April 19, 2012, UCE 4599 conducted a reverse money laundering deal with NIEH for $70,000 and UCE 4599 paid NIEH $7,000 for the transaction. NIEH also provided UCE 4599 with a Rossi Firearms .22 caliber revolver and seven rounds of .22 caliber ammunition, free of charge.

On April 20, 2012, UCE 4599 paid CHOW $2,000. UCE 4599 presented CHOW with a white envelope containing $2,000. UCE 4599 informed CHOW he and NIEH had a great quarter and thanked CHOW for the opportunity to work with NIEH. CHOW said he would not argue with UCE 4599. UCE 4599 thanked CHOW again for the opportunity to work with NIEH. CHOW responded by saying, "I didn't give you that much opportunity, did I?" UCE 4599 and CHOW laughed.

On May 10, 2012, UCE 4599 conducted a reverse money laundering deal with NIEH for $60,000 and paid NIEH $6,000 for conducting the transaction.

As indicated above, CHOW had previously expressed that he did not trust CHIU to continue laundering money with UCE 4599. On May 2, 2012, CHOW was intercepted pursuant to Court Order talking with NIEH about whom to steer UCE 4599 to within the organization to launder money. CHOW expressed concern about using YUN because she was close to NIEH and had a lot of bank accounts. They discussed using James PAU, YUN's husband.

48

On May 3, 2012, UCE 4599 and NIEH met with YUN and PAU. During the ride to the meeting, NIEH and UCE 4599 discussed that CHOW didn't want UCE 4599 to use YUN to launder money because she handled CHOW's personal finances and for the CKT. NIEH recommended PAU to launder money. At lunch, when PAU and CHOW had walked away, UCE 4599 described to YUN that his money came from a Mendocino County marijuana operation and illegal gambling businesses. PAU joined the conversation after and UCE 4599 asked YUN how she would launder money with UCE 4599 and they discussed setting up a company. YUN and PAU expressed interest in laundering money for UCE 4599, but reiterated that they would need to get CHOW's permission to do it. YUN and PAU shook hands with UCE 4599. UCE 4599 asked YUN if she and PAU were going to approach the relationship with UCE 4599 as a team and YUN replied "yeah." NIEH then received a call from CHOW and handed the phone to YUN. YUN walked outside to speak with CHOW but the call was intercepted pursuant to Court order. CHOW told YUN she had a huge responsibility. YUN said she acknowledged that and that's why she would let PAU handle it. CHOW said they would discuss it later on. YUN said that she thought CHOW approved working with UCE 4599 early on and that's why she pursued it. CHOW said he did not approve. YUN said that NIEH told YUN that he had told CHOW. CHOW said there was nothing for him to say since it does not involve him. CHOW told YUN to call him when she is done with the matter. YUN returned to the table and UCE 4599 said he was buying lunch for his two new business partners (YUN and PAU). YUN told UCE 4599 that his sales pitch had worked. During the ride after, they discussed people in a real estate scam getting caught. PAU said people who use their brains to steal as opposed to a gun are his "heroes." UCE 4599 told PAU they would get along fine. PAU said "big cut, big risk" and advised UCE 4599 to keep everything under the radar. Later, NIEH told UCE 4599 that everything CHOW asked PAU and YUN to do was a favor to CHOW and that PAU and YUN did not receive payment for services. NIEH said CHOW was playing dumb when he talked to YUN at lunch and did not want to implicate himself.

On May 6, 2012, NIEH and CHOW were intercepted in NIEH's car discussing allowing YUN and PAU to launder money for UCE 4599. CHOW discussed how he stays out of the transactions, but that YUN is CKT and if she got caught, it would be bad for all of them. CHOW discussed his defense is that he doesn't really know what the rest of them were doing. On May 16, 2012, UCE 4599 conducted a reverse money laundering deal with Leslie YUN for $30,000 and paid her $3,000 for conducting the transaction. NIEH picked up UCE 4599 in his car and drove to Millenium Therapeutics, a massage parlor where YUN had an office. UCE 4599 provided YUN with $33,000 cash -- $30,000 to launder and $3,000 as payment for laundering. On May 22, 2012, $30,000 was wired from a Bank of America account held by YUN into UCE 4599's fictitious business account. On May 24, 2012, UCE 4599 paid CHOW $2,000 for allowing him to work with YUN and PAU. **I believe this demonstrates probable cause for a violation of Title 18, United States Code, Section 1956(a)(3)(A) and (B) and 2 by YUN, PAU, NIEH, and CHOW.**

On June 20, 2012, UCE 4599 conducted a reverse money laundering deal with YUN and PAU, with NIEH present. The deal was for $60,000 and UCE 4599 paid them $6,000 for conducting the transaction. NIEH told UCE 4599 that CHOW knew about the deals with YUN and PAU and that CHOW said "good luck." NIEH also discussed selling firearms to UCE 4599.

On June 27, 2012, UCE 4599 sold purportedly stolen liquor to Ming MA and Hon SO with assistance from NIEH. UCE 4599 sold 12 cases of Johnnie Walker Blue Label Scotch for $6,480 to MA and SO at the New Asia Restaurant in Chinatown, San Francisco. UCE 4599 paid MA $400 for his assistance in setting up the sale. UCE 4599 paid NIEH $500 for his assistance.

On June 27, 2012, UCE 4599 paid CHOW $2,500. UCE 4599 asked CHOW to take a brief walk with him before dinner with NIEH and Keith JACKSON. During the walk, UCE 4599 handed CHOW an envelope containing $2,500. UCE 4599 explained to CHOW there was a little extra money in the envelope because UCE 4599 worked with Ming MA selling stolen liquor to the New Asia Restaurant.

1  UCE 4599 told CHOW he appreciated the opportunity to work with CHOW's people. CHOW

2  repeatedly said "no, no, no", but took the envelope out of UCE 4599's hand immediately.

3      On July 6, 2012, NIEH picked up UCE 4599 and drove him to meet CHANTHAVONG. In Daly

4  City, CHANTHAVONG gave UCE 4599 approximately 4 pounds of marijuana.

5      On July 19, 2012, UCE talked with NIEH. NIEH said CHOW wanted to know if UCE 4599 had

6  access to cigarette filters. UCE 4599 said he couldn't just get filters. NIEH stated he assumed that UCE

7  4599 did not have access to filters and that NIEH had told CHOW that UCE 4599 only had access to

8  "finished product." NIEH also said he told CHOW that UCE 4599 "just rips off trucks." NIEH and

9  UCE 4599 met with YUN and YUN said she had a customer in New York lined up for 50 master cases

10  of cigarettes at $32 per carton. YUN said she might have another customer for another 50 master cases.

11  UCE 4599 expressed concern about being robbed and YUN said she was well protected in New York

12  and that YUN would handle all the cash. YUN warned UCE 4599 to be careful since dealing in tobacco

13  was a more serious offense.

14

15

16      On August 9, 2012, UCE 4599 conducted a sale of 50 Master Cases of purportedly stolen

17  cigarettes (in excess of 10,000 cigarettes) without any tax stamps on them with the assistance of YUN

18  and NIEH. The cigarettes were exchanged for the money -- $96,010 in cash -- with YUN and other

19  individuals in Flushing, New York. UCE 4599 paid YUN $12,010 for her part in setting up the sale and

20  paid NIEH $5,000 for his part.

21

22      On August 16, 2012, UCE 4599 conducted a reverse money laundering deal with YUN and

23  NIEH for $60,000 each. YUN and NIEH were each paid $6,000 for conducting the transaction.

24      On August 16, 2012, UCE 4599 paid $7,000 to CHOW for allowing him to work with his people

25  and for the cigarette deal with YUN. The UCE presented CHOW with a white envelope containing

26  $7,000. The UCE informed CHOW he sold some cigarettes in New York with some people in CHOW's

27  organization. The UCE thanked CHOW for the opportunity to work with his people. CHOW said "I

28

didn't do anything." CHOW then said "any of our friends is your friends." CHOW repeatedly said "no, no, no" while taking the envelope of cash. The UCE told CHOW on two occasions not to take the envelope of cash if he felt uncomfortable. CHOW said "you guys are doing good." CHOW took the envelope and put it in his jacket pocket. CHOW said he would pay the UCE back once CHOW's book deal was signed. The UCE told CHOW he didn't have to pay the UCE back. The UCE explained if it weren't for CHOW and his people the UCE would not have had the opportunity to conduct illegal business in San Francisco. During that night, KEITH JACKSON informed UCE 4599 that his son, later identified as BRANDON JACKSON, was shipping approximately 300 pounds of marijuana to Memphis, Tennessee per month. KEITH JACKSON advised his son was making approximately $50,000 per week. KEITH JACKSON advised his son was looking for a contact who could get large amounts of prescription medication like Oxycotin or Hydrocodone. UCE 4599 told KEITH JACKSON he may have someone who could facilitate the request.

On September 8, 2012, UCE 4599 attended a CKT dinner. UCE 4599 walked into the restaurant and observed CHOW, NIEH, YUN, MA, PAU, MEI, and SIU all working at the event by performing a variety of functions. UCE 4599 sat at a table with KEITH JACKSON and BRANDON JACKSON. UCE 4599 agreed to set up a follow up meeting with BRANDON JACKSON and KEITH JACKSON to discuss the sale and transportation of narcotics. At one point in the evening, NIEH and MA pulled UCE 4599 aside to discuss the previously arranged shipment of 15 cases of stolen liquor scheduled for September 10, 2012. NIEH and MA told UCE 4599 not to worry about off-loading the liquor in front of the restaurant. MA told UCE 4599 he would be interested in future shipments of any high end liquor UCE 4599 could procure. UCE 4599 sat down with LI and CHANTHAVONG. LI informed UCE 4599 he forgot to bring a previously discussed bullet resistant vest for UCE 4599. LI also talked about procuring a gun for UCE 4599. LI had a .357 revolver he referred to as "Big Bertha" but UCE 4599 declined the offer. LI told UCE 4599 if you run out of bullets you could use the gun as a hammer. LI

1  talked about getting UCE 4599 a .45 caliber gun.

2       On September 10, 2012, UCE 4599 sold purportedly stolen liquor to Han SO with the assistance
3  of Ming MA and NIEH.  The sale was for $8,100 for 15 cases of Johnnie Walker Blue Label Scotch.
4  UCE 4599 had previously told MA and NIEH that the liquor had been stolen.  The delivery was to Hon
5  SO at New Asia Restaurant.  During the delivery, UCE 4599 told SO to be careful with the liquor and
6
7  SO told UCE 4599 that he would be careful.  UCE 4599 paid MA $500 for his assistance.  On
8  September 19, 2012, UCE 4599 paid CHOW $500 for the liquor deal.  The UCE gave CHOW a white
9  envelope containing $500. The UCE paid CHOW $500 for his assistance in the sale of purportedly
10  stolen liquor on September 08, 2012 to MING MA, a.k.a. Bak Ban and Hon SO.  **I believe this**
11  **demonstrates probable cause for a violation of Title 18, United States Code, Sections 371, 2315 and**
12  **2 by MA, SO, NIEH, and CHOW.**  CHOW said he "could use this."  CHOW said he wanted to
13  introduce the UCE to his narcotics connection.  CHOW talked about "honest mistakes."  CHOW said he
14  doesn't allow people around him to make "honest mistakes".  CHOW mentioned people that were
15
16  involved in the drug trade, and said that they were not very careful.  CHOW told the UCE to be very
17  careful when dealing with people.  On the ride back to the UCE's apartment, CHOW and the UCE talked
18  about the corrupt nature of politics in San Francisco.  CHOW commented how San Francisco has
19  changed over the years.  While the city itself looks clean, CHOW believed San Francisco was dirtier
20  because of public corruption.  CHOW expressed his dislike for politicians and said "If I'm into the game,
21  I would step on them, I would nail those guys."  CHOW said "all the people, they play the little dirty shit
22  around me."  CHOW further added "Oh, I'm dirty too, you know, but I'm not dirty to my people."

24       On September 20, 2012, UCE 4599 had dinner with KEITH JACKSON, BRANDON
25  JACKSON, and Marlon SULLIVAN.  BRANDON JACKSON and SULLIVAN described their
26  narcotics trafficking including transporting marijuana to the East Coast and Tennessee.  BRANDON
27  JACKSON and SULLIVAN were interested in UCE 4599 assisting them by providing transportation
28

assistance and supplying them with cocaine and/or other "hard drugs" to sell on their established routes.

UCE 4599 began telling them that was a dangerous business and that they had to be very careful and

ready for it.  They described that they saw UCE 4599 as a potential mentor and that when he was ready

to supply them, they would get into the larger business.  For the next year and a half, KEITH

JACKSON, BRANDON JACKSON, and SULLIVAN solicited UCE 4599 frequently to provide

cocaine for them to sell.  This is the inception of the narcotics conspiracy between these three as it

relates to trafficking narcotics with UCE 4599.  **I believe this and subsequent conduct demonstrates**

**probable cause for a violation of Title 21, United States Code, Section 846 by Keith JACKSON,**

**Brandon JACKSON, and SULLIVAN.**

On September 26, 2012, CHANTHAVONG, LI, and NIEH facilitated the sale of a firearm to

UCE 4599 for $600.  The firearm was a Rossi .22 caliber, serial number 69874.  CHANTHAVONG

gave the firearm to UCE 4599 in his vehicle.  LI told UCE 4599 that he had given the gun to

CHANTHAVONG to sell to UCE 4599.  All three, CHANTHAVONG, LI, and NIEH, were convicted

felons at the time of the sale.  According to contacts with the Bureau of Alcohol, Tobacco, Firearms and

Explosives (hereafter "ATF"), and their records checks, none were licensed firearms dealers.  The .22

caliber firearm had "Made in Brazil" stamped on it.  Research of information available on open source

websites shows that the weapon was not manufactured in California.  **I believe this demonstrates**

**probable cause for a violation of Title 18, United States Code, Sections 922(a)(1), 922(g) and 2 by**

**CHANTHAVONG, LI, and NIEH.**

On October 2, 2012, CHANTHAVONG and NIEH sold a firearm to UCE 4599 for $1,000.  The

firearm was a Daewoo DR-200 .223 caliber rifle, serial number RA001216.  Both CHANTHAVONG

and NIEH were convicted felons at the time of the sale.  According to ATF records checks, neither was

a licensed firearms dealer.  I have conducted research and determined that the Daewoo rifle was

manufactured by Kimber in Oregon. **I believe this demonstrates probable cause for a violation of**

**Title 18, United States Code, Sections 922(a)(1), 922(g) and 2 by CHANTHAVONG, and NIEH.**

On October 11, 2012, UCE 4599 conducted reverse money laundering deals with NIEH and

YUN, each for $60,000. UCE 4599 paid $6,000 each for conducting the transactions.

On October 18, 2012, UCE 4599 paid $2,000 to CHOW. UCE 4599 told CHOW that UCE 4599

was doing good business with NIEH. CHOW took the money and said thank you.

On October 24, 2012, Oakland Police Department and FBI executed searches pursuant to state

search warrant at CHANTHAVONG's residence in Daly City. Inside, they found a grow with 91

marijuana plants, scales, a pressed brick of approximately 1.78 kilos of cocaine, a Taurus semi-

automatic pistol, .45 caliber, Model PT 145, and 18 rounds of ammunition. CHANTHAVONG was

present in the home. They also found keys to a warehouse and, pursuant to search warrant, searched a

warehouse at 2715 Magnolia Street in Oakland. There they found 496 marijuana plants, grow lights,

other growing equipment, a red hydraulic press to press kilograms of powder narcotics with trace

amounts of cocaine on it, a digital scale with trace amounts of cocaine on it, and other items. The drugs

were tested by DEA Laboratory. **I believe this demonstrates probable cause for a violation of Title**

**21, United States Code, Sections 841(a)(1)(B) and a violation of Title 18, United States Code,**

**924(c) by CHANTHAVONG.**

On October 30, 2012, Antioch Police Department and FBI Agents conducted a search at a

warehouse in Antioch, California. Law enforcement found a grow throughout the warehouse with 803

marijuana plants, currency, indicia, and a map with the area of Michael MEI's house circled. Inside the

grow, working, were Michael MEI's parents. The parents were arrested and then released. The plants

tested positive as marijuana. On November 14, 2012, NIEH talked to UCE 4599 about the search and

said that MEI's parents were arrested, but that the grow was actually MEI's grow. On December 12,

2012, NIEH told UCE 4599 that MEI was YUN's supplier for marijuana. On March 29, 2013, UCE

4599 talked to MEI.  UCE 4599 told MEI that he had heard about the search on MEI's grow and MEI responded "it was hectic, it was crazy, it was crazy.  Everything is good."  **I believe this demonstrates probable cause for a violation of Title 21, United States Code, Sections 841(a)(1)(B) by MEI.**

On November 19, 2012, UCE 4599 met with KEITH JACKSON and discussed Senator YEE.  During the meeting, UCE 4599 and KEITH JACKSON discussed getting UCE 4599 back together with BRANDON JACKSON to discuss narcotics trafficking and money laundering.

On December 12, 2012, UCE 4599 conducted a reverse money laundering deal with NIEH for $70,000 and paid NIEH $7,000 for conducting the transaction.  On the same date, UCE 4599 paid CHOW $2,000.  UCE 4599 handed CHOW a white envelope containing $2,000.  UCE 4599 told CHOW he had a very successful year working with members of CHOW's organization.  Specifically, UCE 4599 thanked CHOW for the opportunity to work with NIEH and YUN.  CHOW said "you are doing good."  UCE 4599 told CHOW "we are all doing good."  UCE 4599 expressed his gratitude to CHOW for introducing UCE 4599 to good friends and trusted brothers.  UCE 4599 told CHOW he had an upcoming meeting with SENATOR LELAND YEE to discuss having CHOW's ankle monitoring device removed.  UCE 4599 told CHOW he introduced an individual through KEITH JACKSON who helped Senator YEE a great deal.  UCE 4599 told CHOW that SENATOR YEE owes UCE 4599 and his family.  UCE 4599 talked to CHOW about growing new illegal business opportunities over the following year.  They discussed CHANTHAVONG being arrested for drugs and UCE 4599 wanting to launder money for TINA LIANG.

On January 10, 2013, UCE 4599 sold purportedly stolen cigarettes without tax stamps, with the assistance of James PAU and Leslie YUN.  UCE 4599 met YUN and PAU in Flushing, New York.  The cigarettes (in excess of 10,000 cigarettes) were sold for $192,000.  YUN and PAU received $24,000 for setting up the deal.

On January 16, 2013, UCE 4599 paid both NIEH and CHOW $7,000 for facilitating the cigarette deal in New York. UCE 4599 told NIEH and CHOW he was with JAMES PAU and LESLIE YUN the previous week. UCE 4599 sold purportedly stolen cigarettes to YUN and PAU's associates. UCE 4599 presented CHOW with two white envelopes each containing $7,000. UCE 4599 asked CHOW to pick an envelope. CHOW picked an envelope and said "that look like bigger one." NIEH took and envelope and said "thanks [UCE 4599]." UCE 4599 told CHOW and NIEH he was very impressed on how well PAU managed the stolen cigarette transaction. NIEH replied "PAU is no joke, man." UCE 4599 told CHOW he wouldn't have the opportunity to do business without CHOW's permission. CHOW said he didn't know PAU and YUN were in New York. UCE 4599 told CHOW it was better to keep CHOW out of the transaction because he was the Dai Lo. CHOW said "you guys are doing bad things." The UCE told CHOW that's how they make a living. CHOW jokingly replied "I'm rehabilitated. You are very, very bad." UCE 4599 told CHOW and NIEH he was surrounded by good people and trusted brothers. NIEH replied "Good people doing bad things." UCE 4599 told CHOW he would be meeting with Senator Leland YEE in the near future. The UCE told CHOW he would speak to YEE about having CHOW's ankle monitor removed. CHOW thought YEE would be scared to talk the UCE because of the UCE's criminal background. UCE 4599 explained YEE would have to earn the UCE's friendship by doing favors for UCE 4599. UCE 4599 told CHOW he was a loyal brother to CHOW and a good earner for CHOW's organization. UCE 4599 told CHOW he had a vested interest in having CHOW's ankle monitor removed because CHOW would have the ability to introduce UCE 4599 to more people. UCE 4599 told CHOW he had made UCE 4599 a lot of money because of CHOW's introductions to the right people. CHOW thought SENATOR YEE could not be trusted. UCE 4599 agreed with CHOW. UCE 4599 told CHOW and NIEH he was very impressed with the way PAU managed the stolen cigarette transaction. The last time UCE 4599 sold stolen cigarettes to YUN's associates in New York it took over six hours. The cigarette deal on January 10, 2013, took slightly

over one hour.  UCE 4599 told CHOW he trusted PAU so much, he didn't even bother counting the money owed for the stolen cigarettes.  UCE 4599 explained details of the stolen cigarette transaction to CHOW and NIEH.  Shortly after, NIEH asked UCE 4599 if he was able to obtain stolen liquor.  UCE 4599 told NIEH he would check with his associates in New Jersey.  UCE 4599 said he believed there wasn't a lot of profit margin in the sale of the stolen liquor but would do it as a favor to CHOW and NIEH's associates.   UCE 4599 told CHOW and NIEH he was supposed to meet with Al NHINGSAVATH on his most recent trip to New York City.  NHINGSAVATH wanted UCE 4599 to exchange smaller denominations of U.S. currency for one-hundred dollar bills.  UCE 4599 advised he was unsuccessful meeting with NHINGSAVATH while he was in New York.  After lunch, CHOW, NIEH and UCE 4599 stood outside of the restaurant.  CHOW talked about the CKT being a "secret society."  CHOW wanted to focus on bringing attention to the positive things the CKT was doing in the community.  UCE 4599 agreed with CHOW but told him there is also the other side of the CKT that had to "take care of business," referring to criminal activity.  CHOW told UCE 4599 s/he, UCE 4599, was the "bad part" of the CKT.  NIEH and CHOW drove UCE 4599 back to his apartment.  During the ride, NIEH asked what type of stolen liquor UCE 4599 had available.  NIEH also asked the UCE when the next round of "coffee" would be.  The term coffee is code for money laundering.  UCE 4599 told NIEH within a few weeks.  CHOW advised UCE 4599 to slow down.  UCE 4599 talked about being careful when choosing the right criminal activity to get involved with.  UCE 4599 told CHOW he wanted to be safe and utilize the resources around him.  CHOW told UCE 4599 he tries not to think about criminal activity but when he does, it's "nothing but trouble."  UCE 4599 told CHOW he, CHOW, surrounds himself with good people.  UCE 4599 hoped CHOW thought of him as a trusted brother.  CHOW told UCE 4599 he was family and was a "good brother."

On January 23, 2013, UCE 4599 purchased a firearm from CHANTHAVONG and LI for $1,000.  The firearm was a Ruger SR40, serial number 342-084-83, with two magazines and 28 rounds

of ammunition. According to Ruger, it manufactures firearms in New Hampshire and in Arizona and does not manufacture firearms in California. LI offered to get whatever weapons UCE 4599 wanted and asked UCE 4599 to put together a list. LI offered that he and CHANTHAVONG would do "collections" for UCE 4599, meaning that they would collect unlawful debts for UCE 4599, through a "good guy, bad guy" routine. LI said that when he scratched his head, that would be the signal for CHANTHAVONG to slap the guy in the face. UCE 4599 said he would consider it. They discussed one of LI's associates in his marijuana business who was arrested in Pennsylvania with 50 pounds of marijuana and asked UCE 4599 about his marijuana prices. **I believe this demonstrates probable cause for a violation of Title 18, United States Code, Sections 922(a)(1), 922(g) and 2 by CHANTHAVONG and LI.**

On February 5, 2013, UCE 4599 met with Tina LIANG. Tina LIANG asked if UCE 4599 was still charging five percent to launder money. UCE 4599 told Tina LIANG that he charged 4% to launder quantities under $100,000 and 3% for quantities in excess of $100,000. Tina LIANG stated that her associate was recently pulled over in a traffic stop and lost approximately $170,000. Tina LIANG said another associate lost about the same amount. UCE 4599 told Tina LIANG that it was very risky to transport money from New York to San Francisco. Tina LIANG said she believed that members of CHOW's organization were transporting marijuana and selling it to people in Flushing, New York. Tina LIANG asked about any more access to stolen liquor. UCE 4599 told Tina LIANG that the profit margin wasn't big enough in stolen liquor. UCE 4599 told Tina LIANG that he preferred to sell stolen cigarettes. Tina LIANG said people recently got arrested for that in New York City and asked what brand of cigarettes UCE 4599 could get. Tina LIANG asked if UCE 4599 could assist in recovering the $170,000 that was taken by law enforcement. Tina LIANG stated she was paying approximately $1,800 for a pound of marijuana. Tina LIANG told UCE 4599 that her associates were looking to launder approximately $500,000 per week from New York to San Francisco. Tina LIANG said that she met someone in CHOW's organization named "Kevin" and that she trusted CHOW, but didn't trust "Kevin."

Tina LIANG said "Kevin" tried to sell Tina LIANG purportedly "Sour Diesel" grade marijuana.  Tina LIANG said she found out that the purported "Sour Diesel" was actually marijuana of lesser quality.

On February 14, 2013, UCE 4599 conducted a reverse money laundering deal with NIEH for $80,000 and paid NIEH $8,000 for conducting the transaction.  On the same date, UCE 4599 paid CHOW $2,000.  UCE 4599 gave CHOW an envelope containing $2,000.  UCE 4599 told CHOW s/he would be doing some illegal business with NIEH later in the day.  The UCE thanked CHOW for the opportunity to work with his people.  CHOW laughed and said "No, no, I didn't give you the opportunity; you make your own opportunity.  Damn, that is bribery money dude, that's not good."  CHOW thanked UCE 4599 and told the UCE he was a good friend and a trusted brother.  NIEH drove CHOW to the Chinatown section of San Francisco.  The UCE and CHOW joked about the UCE's relationship with NIEH.  The UCE asked what CHOW thought NIEH and the UCE did at the UCE's apartment.  CHOW responded "That's terrible dude, I don't want to know, that's illegal stuff, I don't want to know."

On March 29, 2013, UCE 4599 attended the CKT annual event.  There, a member of SENATOR YEE's staff presented a proclamation from the California State Senate, provided by SENATOR YEE, for the CKT.  UCE 4599 discussed conducting money laundering transactions for CHANTHAVONG, LI, and Albert NHINGSAVATH.  CHANTHAVONG and Michael MEI described recent law enforcement busts of their marijuana grow operations.  CHANTHAVONG said he was transporting 100 pounds of marijuana to the East Coast per week and that he needed help laundering the funds.  LI also discussed committing violence against others for the benefit of the CKT and for his own personal enjoyment.  It was described to UCE 4599 that CHANTHAVONG and NHINGSAVATH reported to LI.  LI, CHANTHAVONG and NHINGSAVATH asked about UCE 4599 laundering their drug money from the East Coast.  UCE 4599 told them he would charge 4% for anything smaller than $100,000 and 3% for anything more than $100,000.

60

On April 11, 2013, UCE 4599 conducted reverse money laundering deals with NIEH and YUN. The deal with NIEH was for $70,000 and UCE 4599 paid NIEH $7,000 for conducting the transaction. The deal with YUN was for $30,000 and UCE 4599 paid YUN $3,000 for conducting the transaction.

On April 16, 2013, UCE 4599 engaged with LI and Albert NHINGSAVATH to launder their money, traditional money laundering, by having an associate (another UCE) pick up cash in New Jersey, launder it through UCE 4599's "legitimate" business, and deliver cash in San Francisco to NHINGSAVATH.  When I use the phrase "traditional" money laundering, I am referring to the UCE laundering actual proceeds of specified unlawful activity from the targets, which violates 18 U.S.C. Section 1956(a)(1), as contrasted with "reverse" money laundering where the targets agree to launder funds that the UCE has represented to be proceeds of specified unlawful activity, which violates 18 U.S.C. Section 1956(a)(3).  The money came from LI and NHINGSAVATH's illegal narcotics business, trafficking from the West Coast to the East Coast.  UCE 4599's associate picked up $50,000 in cash from an associate of LI and NHINGSAVATH later identified as Norge MASTRANGELO in New Jersey.  The money was then laundered through UCE 4599's "accounts" and delivered – minus a 4% laundering fee – by UCE 4599 to NHINGSAVATH in San Francisco.  These transactions promoted the illegal business as well as concealing the true nature and source of the funds.  On April 17, 2013, UCE 4599 paid $2,500 to CHOW.  UCE 4599 gave CHOW an envelope containing $2,500.  UCE 4599 thanked CHOW for the opportunity to do business with NIEH, YUN, LI, and NHINGSAVATH. CHOW told UCE 4599 "Thank you."  UCE 4599 told CHOW the envelope was open and to be careful not to drop it.  CHOW replied, "I drop it in my pocket" then laughed.  UCE 4599 thanked CHOW for smoothing over the relationship between Andy LI and Albert NHINGSAVATH. **I believe this demonstrates probable cause for a violation of Title 18, United States Code, Sections 1956(a)(1)(A) and (B) and 2 by LI, NHINGSAVATH, MASTRANGELO, and CHOW.**  CHOW later told UCE 4599 how to share emails as "drafts" with other people so that law enforcement can't find them as "sent"

1   emails. CHOW asked UCE 4599 about his recent activity. UCE 4599 told CHOW his illegal gambling

2   business was starting to slow down but was encouraged by the new opportunity to launder drug proceeds

3   with Andy LI and Albert NHINGSAVATH. UCE 4599 told CHOW in the past, LI and

4   NHINGSAVATH were having people transport large amounts of cash by strapping it to their bodies to

5   avoid detection by airport security. CHOW told UCE 4599 back in the old days that was an acceptable

6   way to transport cash but not by today's standards. UCE 4599 told CHOW he offered an expedited safe

7   service in laundering their drug proceeds. UCE 4599 told CHOW that LI and NHINGSAVATH were

8   laundering small amounts of cash. UCE 4599 told CHOW he would give CHOW a big portion of UCE

9   4599's profit from the laundered money. UCE 4599 was hoping LI and NHINGSAVATH would start

10  to launder larger sums of money with UCE 4599. CHOW told UCE 4599 he should let LI and

11  NHINGSAVATH know UCE 4599's expectations. CHOW explained there are lots of smaller criminal

12  crews in the San Francisco Bay Area. Each crew has their own leader. CHOW was not the leader of the

13  smaller crews but when CHOW "calls them out" they all come out to support CHOW. CHOW said "If

14  anyone fucks with me, they are done for." If one day CHOW needed the criminal crews he expected

15  they would be there for him. CHOW told UCE 4599 if UCE 4599 had any problems with any of

16  CHOW's associates UCE 4599 should let CHOW know. UCE 4599 asked ANDY LI if he was happy

17  with the money laundering services provided by UCE 4599. LI and NHINGSAVATH were happy with

18  UCE 4599's services. LI thought it was more about "getting your toes wet" and creating a trusting

19  relationship with UCE 4599. If something happened to the money entrusted to UCE 4599, LI told UCE

20  4599 he would "come after your ass."

21          On April 29, 2013, UCE 4599 conducted a money laundering transaction with LI,

22  NHINGSAVATH, and MASTRANGELO. The money, $80,314, had been picked up from

23  NHINGSAVATH and MASTRANGELO in New Jersey on April 25, 2013. UCE 4599 returned

24  $77,100 to NHINGSAVATH and MASTRANGELO in San Francisco.

On May 6, 2013, UCE 4599 purchased a Smith and Wesson, Model M&P 15-22, and eight rounds of .22 LR ammunition from KEITH JACKSON and BRANDON JACKSON. They discussed a cocaine deal. UCE 4599 also provided a $5,000 check for "Leland Yee for Secretary of State" in exchange for the proclamation to the CKT.

On May 14, 2013, UCE 4599 completed a money laundering transaction with Albert NHINGSAVATH, MASTRANGELO, and LI. MASTRANGELO had delivered $99,275 in New Jersey and UCE 4599 provided $96,275 to NHINGSAVATH in San Francisco.

On May 15, 2013, UCE 4599 paid $1,000 to CHOW. UCE 4599 thanked CHOW for fostering the relationship between LI, NHINGSAVATH, and UCE 4599. CHOW asked how LI and NHINGSAVATH were doing. UCE 4599 stated that they were doing well and he was laundering a lot of their money. UCE 4599 told CHOW he thought he would launder over one million dollars of drug proceeds with LI and NHINGSAVATH during the next 6 or 7 months. UCE 4599 also said he was unable to come to an agreement with YUN on the sale of cigarettes. NIEH was present during these conversations.

On June 14, 2013, NIEH drove UCE 4599 to meet with YUN. During the drive, NIEH told UCE 4599 that Xiu Ling LIANG, a/k/a Elaine LIANG, wanted UCE 4599 to launder money from Boston to San Francisco. NIEH called Elaine LIANG from his car phone. LIANG asked how much UCE 4599 charged and NIEH said 10% for money laundering, 4% for exchanging money. Elaine LIANG said she usually does it twice a week for $200,000 each time. CHOW called and NIEH described them trying to meet with Elaine LIANG. Later that day, UCE 4599 conducted a reverse money laundering deal with NIEH for $77,000 and paid NIEH $7,000.

On June 19, 2013, UCE 4599 paid CHOW $2,000 and told CHOW that he and NIEH had conducted business last week. CHOW told UCE 4599 he wouldn't say much other than "thank you." CHOW commented that UCE 4599 does nothing but conduct illegal business all day. They discussed

1    CHOW protecting associates with his security. They also discussed UCE 4599 doing business with

2    Elaine LIANG. UCE 4599 told CHOW he was going to New York to conduct another cigarette deal

3    with YUN and PAU. Later, CHOW asked what type of business UCE 4599 wanted to conduct with

4    Elaine LIANG. UCE 4599 said money laundering, the same as with LI and NHINGSAVATH. CHOW

5    said he would look into it for UCE 4599.

6

7        On June 24, 2013, UCE 4599 conducted a purchase of firearms from BRANDON JACKSON,

8    KEITH JACKSON, and Marlon SULLIVAN. UCE 4599 paid $3,400 and received 3 firearms. They

9    discussed UCE 4599 setting them up with a source of cocaine for their narcotics trafficking business.

10       On June 25, 2013, UCE 4599 conducted a purchase of firearms from BRANDON JACKSON,

11   KEITH JACKSON, and SULLIVAN. UCE 4599 paid KEITH JACKSON $5,300 and SULLIVAN

12   $1,400. According to ATF records checks, none of the three are licensed to deal in firearms. KEITH

13   JACKSON told UCE 4599 that he was hoping that UCE 4599 could raise more money for SENATOR

14   YEE. They provided UCE 4599 with one .22 caliber Ruger Model 10/22 carbine; one Cobray

15

16   machinegun pistol; one Mossberg Maverick pump-type shotgun and 12 gauge rounds; one Smith and

17   Wesson, Model 59 handgun; one Colt model MK IV series 80 handgun; one 7.62mm Clayco Sports

18   AKS rifle; 38 rounds of ammunition; and two ballistic vests (including one that was stolen from FBI).

19   They also discussed prices of kilograms of cocaine that they were soliciting UCE 4599 to allow them to

20   purchase for trafficking. **I believe this demonstrates probable cause for a violation of Title 18,**

21   **United States Code, Sections 922(a)(1) and 2 by Keith JACKSON, Brandon JACKSON, and**

22

23   **SULLIVAN.**

24       On July 12, 2013, UCE finished a traditional money laundering transaction involving LI,

25   NHINGSAVATH, and MASTRANGELO. MASTRANGELO had delivered $92,860 in New Jersey,

26   and UCE 4599 gave MASTRANGELO $89,160 in San Francisco. NHINGSAVATH asked if it would

27   be okay to introduce another member of his organization to drop off money, named "Brian."

28

On July 18, 2013, UCE 4599 conducted a deal of purportedly stolen and contraband cigarettes arranged by YUN and PAU.  UCE 4599 met with YUN and PAU in Flushing, New York.  The deal was for 100 master cases which is 120,000 cigarettes (far more than the 10,000 required to trigger the contraband cigarette statute).  YUN agreed to pay $168,000 for the 100 master cases.  PAU and YUN met the UCEs in New York and went to confirm the merchandise.  UCE 4599 wanted to know how PAU wanted his cut.  PAU said to talk to YUN since she was responsible for finances.  PAU said "I just do the work, and George [NIEH] takes care of the Old Man [CHOW]."  PAU reiterated that his position in the CKT was "415," the "white paper fan."  PAU said that YUN was the bookkeeper for the Tong. PAU described that NIEH and CHANTHAVONG were responsible to protect CHOW.  LI was "426" within the Tong, which made him a fighter, and made the shape of a gun with his hand.  PAU said that he, PAU, would be responsible for making the call on a hit and LI would be responsible for carrying it out.  PAU said that CHOW encouraged them to grow their illegal business by working with cultures outside of the Chinese community.  PAU said that LI works directly with CHOW.  PAU discussed the occasional need to kill people by the CKT.  The cigarettes were sold for $167,900.  The money delivered was short $17,900, but later paid by NIEH to UCE 4599.

On July 22, 2013, UCE 4599 conducted a traditional money laundering deal with LI, NHINGSAVATH, and MASTRANGELO.  MASTRANGELO had delivered $45,000 on July 19, 2013 in New Jersey and UCE 4599 delivered $43,200 to NHINGSAVATH in San Francisco.

On July 23, 2013, UCE 4599 collected $17,900 from NIEH that was still owed on the cigarette deal.  UCE 4599 said he was surprised YUN shorted him.  CHOW said "you guys are bad people." UCE 4599 counted $5,000 from the cash and gave it to CHOW and thanked him.  UCE 4599 said they would not have the opportunity to make money without CHOW's permission.  UCE 4599 told CHOW that the cigarette deal with PAU and YUN was successful.  CHOW thanked UCE 4599 and said "I never did anything."  NIEH laughed and said "well, I did."  UCE 4599 also gave $5,000 to NIEH.  UCE 4599

reminded CHOW that CHOW had previously said that "I am successful when my brothers are successful." UCE 4599 reiterated that the cigarette deal went well and that PAU managed the transaction in New York.  CHOW agreed that it was important to handle illegal business in a different location well.  UCE 4599 said that he had faith in PAU and YUN.  CHOW said "you're lucky you know people."  **I believe this demonstrates probable cause for a violation of Title 18, United States Code, Sections 371, 2315, 2342, 2344, and 2 by PAU, YUN, NIEH, and CHOW.**  UCE 4599 and CHOW discussed Elaine LIANG following up to get money laundered by UCE 4599.  UCE 4599 said he wasn't worried about getting shorted on the money for the cigarette deal because YUN's associates knew that UCE 4599 was affiliated with CHOW.  CHOW smiled and said "are you sure?"  They talked about a heroin deal proposed by LI to UCE 4599.  CHOW asked UCE 4599 if he'd ever dealt in heroin before and UCE 4599 said his associates in New Jersey have.  CHOW said it was a very tempting proposition.  UCE 4599 asked for CHOW to vouch for him with the 14K Triad.  CHOW said he would when he met them.  CHOW boasted about all the different criminal enterprises that he knew, including motorcycle gangs.  CHOW said "China White" [high grade heroin] is a scandalous market and it is hard to succeed.  CHOW said he had been approached, but declined and described how to deal in heroin.  CHOW told UCE 4599 not to deal in heroin.  UCE 4599 said he would not, but just make the right introductions between other people, like CHOW does for UCE 4599.

On August 2, 2013, UCE 4599 met with BRANDON JACKSON and KEITH JACKSON to discuss purchasing firearms.  They discussed that BRANDON's source was "Rinn," later identified as Rinn ROEUN.  KEITH JACKSON stated that SENATOR YEE was also associated with a person who was an international arms dealer who was shipping large stockpiles of weapons into a foreign country.  KEITH JACKSON described that SENATOR YEE met the arms dealer a long time ago and had been working with him to ship weapons to a foreign country.

On August 5, 2013, UCE 4599 met KEITH JACKSON and BRANDON JACKSON to purchase

weapons. UCE 4599 paid them $2,000 to purchase several weapons – Norinco 7.62mm x 39mm SKS rifle with a magazine; Norinco 7.62mm x 39mm rifle with a high capacity drum magazine; one semi-automatic 9mm Uzi pistol, Model 8 with a magazine; two additional magazines; 78 rounds of 7.62mm x 39mm ammunition. During the meeting, KEITH JACKSON said that he talked to SENATOR YEE about introducing UCE 4599 to the arms dealer they had previously discussed. According to KEITH JACKSON, SENATOR YEE requested that UCE 4599 raise additional campaign contributions for SENATOR YEE's campaign for California Secretary of State. UCE 4599 said he would make a contribution for an initial meeting and that, if it was successful, UCE 4599 would provide SENATOR YEE with a lot more money. KEITH JACKSON stated that SENATOR YEE also has friends who are trying to move weapons into a foreign country. KEITH JACKSON said he would try to meet with the arms dealer over the next couple days.

On August 8, 2013, UCE 4599 met with KEITH JACKSON and BRANDON JACKSON to purchase four weapons for $6,900. The weapons were one AR-15 type rifle with no serial number or manufacturer stamp; one black Intratec 9mm Luger Mod. Tec 9 assault pistol; one Springfield Armory, Model 1911-A1 .45 caliber pistol; one Bushmaster Carbon-15, .223 caliber rifle; 16 rounds of .223 ammunition and miscellaneous gun parts.

On August 9, 2013, in Atlanta, Georgia, Serge GEE dropped off $93,780 to a UCE for laundering. On August 11, 2013, UCE 4599 completed the money laundering transaction involving GEE, Xiu Ling LIANG, and NIEH. NIEH told UCE 4599 that he had discussed the transaction with CHOW and that CHOW had said that UCE 4599 should have charged for airline tickets. NIEH and UCE 4599 met with Elaine LIANG and GEE. UCE 4599 asked what type of marijuana GEE was selling and GEE said it was indoor grows for $3,800 per pound. GEE said he was nervous about flying with a lot of cash. GEE said he sends several hundred pounds of marijuana per week to the east coast. UCE 4599 provided GEE with $90,180. GEE offered to sell Molly (powder MDMA) to UCE 4599 for

$18,000 per unit.  GEE described having regular drivers and that he also sold kilos of cocaine for

$38,000.  GEE said he trafficked about 200-300 pounds of marijuana per week in Atlanta.  UCE 4599

provided NIEH with $1,000 for his assistance.  NIEH told UCE 4599 "you got to thank the Old Man

[CHOW] that he went to put his name out there."  NIEH told UCE 4599 that he, NIEH, told CHOW

about every criminal business opportunity that UCE 4599 has conducted.  NIEH said CHOW wanted to

know about it.

Later on August 11, 2013, UCE 4599 arranged a meeting with KEITH JACKSON, BRANDON

JACKSON, and SULLIVAN to discuss firearms purchases and cocaine trafficking.

On August 16, 2013, Norge MASTRANGELO and another individual dropped off $199,900 to a

UCE in New Jersey to be laundered.  On August 19, 2013, UCE 4599 delivered $194,000 to

NHINGSAVATH in San Francisco.

On August 26, 2013, UCE 4599 met with KEITH JACKSON, BRANDON JACKSON and

SULLIVAN to purchase a firearm for $600.  The firearm was a Luger 9mm Model Tec 9 assault pistol

with an extended magazine and 50 rounds of Remington 9mm Luger ammunition.

On August 27, 2013, UCE 4599 completed a traditional money laundering deal with GEE, and

Elaine LIANG.  On August 26, 2013, GEE delivered $155,900 to a UCE in Atlanta.  On August 27,

2013, UCE 4599 delivered a box of cash to GEE and ELAINE LIANG, with approximately 4%

retained.

On August 27, 2013, UCE 4599 met with BRANDON JACKSON and Rinn ROEUN to discuss

purchasing additional firearms.  UCE 4599 told ROEUN he was arming his marijuana grows in

Mendocino County.  ROEUN also offered mines, hand grenades and C4.  ROEUN discussed firearms

for sale and also offered to perform protection services for UCE 4599.  ROEUN also offered services to

UCE 4599 "if you want somebody gone."  UCE 4599 asked how much ROEUN charged for killing

someone.  ROEUN said $10,000.  UCE 4599 told ROEUN he had someone in mind and would pay

$25,000 for it.  ROEUN said he would keep that extra $15,000 then.  UCE 4599 began describing the fictitious person who he wanted killed.  ROEUN left the table to go to the bathroom.  UCE 4599 asked if ROEUN was the person that BRANDON JACKSON was referring to when he told UCE 4599 that he, BRANDON JACKSON, had the capabilities to kill someone if needed.  BRANDON JACKSON replied, "he could do it, or I could do it too."  After returning to the table, ROEUN acknowledged that he had provided the last batch of guns for UCE 4599.  ROEUN said he just needed the "specs" for the murder for hire, "is there an alarm, how many people are in the house?"  ROEUN also confirmed he had provided the ballistic vests that UCE 4599 bought.  ROEUN said they were straight from SFPD, but BRANDON JACKSON corrected him that they were from FBI and ROEUN said "oh yeah, yeah."

On August 28, 2013, UCE 4599 was in Las Vegas, Nevada and called ROEUN from his cellular telephone, after missing a call from ROEUN's cellular telephone earlier.  ROEUN said, in connection with the murder for hire, he had spoken to "the guy" and asked UCE 4599 to provide a photograph and address of the victim.  ROEUN said his guy needed two to three weeks to do his "homework" on the victim and then the "job will get done."  ROEUN said he would pick up the picture and address of the intended victim from UCE 4599.  UCE 4599 told ROEUN he wanted to give the victim another chance to redeem himself but if it did not work out, then UCE 4599 would hire ROEUN.  ROEUN said "okay, I mean, I got you."  **I believe this demonstrates probable cause for a violation of Title 18, United States Code, Section 1958 by ROEUN.**

On August 30, 2013, an associate of NHINGSAVATH dropped off $114,860 with a UCE in New Jersey.  On September 3, 2013, UCE 4599 completed a traditional money laundering deal with MASTRANGELO, LI, and NHINGSAVATH.  On September 3, 2013, UCE 4599 arranged with NHINGSAVATH to drop off $111,415 in a brown paper bag with an individual known to be associated with NHINGSAVATH.  After the transaction, UCE 4599 confirmed the drop off with NHINGSAVATH via a telephone call between UCE 4599 and NHINGSAVATH.

On September 3, 2013, GEE had arranged with a UCE in Atlanta, Georgia, to pick up $76,030 in cash from two unknown individuals. GEE directed the UCE to the two individuals via phone calls and text messages. The two individuals were a white male and white female who let the UCE talk to GEE on the phone while handing the UCE a bag with cash in it, and GEE stated that it was "76" in the bag. On September 6, 2013, UCE 3322 completed a traditional money laundering deal with GEE and Elaine LIANG. On September 6, 2013, UCE 3322 delivered $73,000 to GEE. GEE then left with an individual later identified as Gary CHEN.

On September 9, 2013, in Atlanta, Georgia, GEE arranged for an unknown person to deliver $203,000 in shrink-wrapped packages to a UCE. On September 10, 2013, UCE 4599 completed a traditional money laundering deal involving NIEH, GEE and Elaine LIANG in Millbrae, California. On September 10, 2013, UCE 4599 delivered a FedEx box with $195,000 to GEE and Elaine LIANG. GEE took out some of the money and gave it to LIANG and said "pay the rent." GEE discussed paying UCE 4599 monthly to launder $3,000,000 per month. GEE said he was distributing approximately 800 pounds of marijuana per month. UCE 4599 paid NIEH $1,000 for his assistance. NIEH described that CHOW had a fight with LI and had a falling out with LI and CHANTHAVONG. NIEH said CHOW had ordered NIEH to "pop" LI the next time he saw him, but NIEH was hoping they would work out their problems in a civil way. On September 12, 2013, UCE 4599 met with NIEH and CHOW. CHOW told UCE 4599 that he was a "hustler." UCE 4599 gave CHOW an envelope with $3,000 and apologized for not getting it to CHOW sooner. CHOW thanked UCE 4599 and told him not to worry about the delay. UCE 4599 told CHOW he was making a lot of money working with Elaine LIANG and would not have had that opportunity if CHOW had not talked to Elaine LIANG on UCE 4599's behalf. CHOW laughed and told UCE 4599 to stop "doing illegal stuff." UCE 4599 told CHOW that LIANG and her son, GEE, were transporting large amounts of drugs to the east coast and making a lot of money. CHOW warned UCE 4599 to be careful. UCE 4599 asked if CHOW knew GEE and CHOW said "of

70

1  course." CHOW said not to trust anyone. **I believe this demonstrates probable cause for a violation**
2  **of Title 18, United States Code, Sections 1956(a)(1)(A) and (B) and 2 by Elaine LIANG, GEE,**
3  **NIEH, and CHOW.**
4      On September 13, 2013, UCE 4599 met with LI and NHINGSAVATH in San Francisco to
5  conclude a traditional money laundering deal. On September 11, 2013, MASTRANGELO and an
6  associate had delivered $262,435 to a UCE in New Jersey. On September 13, 2013, UCE 4599
7  delivered $200,000 to NHINGSAVATH in a FedEx box. UCE 4599 told LI he was looking to purchase
8  3-5 pounds of indoor marijuana. LI said it would cost $2,600 per pound. LI described that he fought
9  CHOW because CHOW never owned up to ordering the 1991 arson committed by LI where LI was
10 severely burned. LI said it was a "chain of command" issue. LI wanted to "smash" people who spread
11 rumors about his fight with CHOW. UCE 4599 told LI that his people in New Jersey were not as
12 reliable as they should be. LI said he would fix that. On September 17, 2013, UCE 4599 met with
13 NHINGSAVATH and delivered the remaining $55,125.
14     On September 13, 2013, UCE 4599 met with KEITH JACKSON and said he was skeptical of
15 SENATOR YEE's ability or desire to introduce him to the arms dealer. KEITH JACKSON said it was a
16 real opportunity and that it was SENATOR YEE who approached JACKSON with the opportunity.
17 JACKSON said that the trafficker was "the real deal" but wanted to move at a slower pace.
18     On September 13, 2013, UCE 4599 met with ROEUN to purchase firearms. ROEUN delivered a
19 TAPCO AK-47 assault rifle with a scope and flashlight and a magazine for $2,000. UCE 4599 told
20 ROEUN that he had decided to follow through with the murder for hire after the holidays and would pay
21 $25,000. UCE 4599 said he would provide a photo and an address and ROEUN said "the job will get
22 done."
23     On September 18, 2013, UCE 4599 completed a traditional money laundering deal with GEE
24 and ELAINE LIANG. On September 16, 2013, a UCE had picked up $107,400 in shrink-wrapped

packages from an associate of GEE. The associate stated that he would likely be the person making future cash transactions. On September 18, 2013, UCE 4599 rode with NIEH to meet GEE and ELAINE LIANG to deliver the cash minus 4% transaction fee. After the meeting, GEE and ELAINE LIANG left and GEE kept the FedEx box and got into a car registered to Anthony LAI.

On September 18, 2013, UCE 4599 met with LI and CHANTHAVONG in San Francisco. LI delivered a brown cardboard box and said it had five pounds of "Sour Diesel" [marijuana]. UCE 4599 paid LI $13,000. They walked to talk to CHANTHAVONG. CHANTHAVONG said that law enforcement was trying to eradicate large scale outdoor grows. A presumptive test showed positive for marijuana. **I believe this demonstrates probable cause for a violation of Title 21, United States Code, Section 846 by CHANTHAVONG and LI.**

On September 20, 2013, UCE 4599 met with ROEUN in San Francisco. ROEUN provided UCE 4599 with a Calico, Model M-951, 9mm pistol with a threaded barrel fitted with a silencer. ROEUN stated that the silencer was homemade but that it was operational.

On September 26, 2013, UCE 4599 completed a traditional money laundering deal started earlier that day in Atlanta. GEE met with a UCE in Atlanta and delivered $150,000 to that UCE in a white plastic garbage back inside of a brown leather bag. On the same date, UCE 4599 and NIEH met with Elaine LIANG at a restaurant in Millbrae, California. UCE 4599 provided Elaine LIANG with a FedEx box containing $139,200.

On October 1, 2013, UCE 4599 completed a traditional money laundering deal with GEE. Earlier that day, CHEN had delivered $189,780 in cash to a UCE in New Jersey. Later, NIEH picked up UCE 4599 and UCE 4599 delivered $182,110 to GEE in Millbrae. GEE's driver was identified as Anthony LAI.

On October 2, 2013, UCE 4599 arranged to meet CHOW and NIEH to provide a payment to CHOW for recent money laundering transactions with Elaine LIANG and GEE. UCE 4599 was picked

up by NIEH and CHOW and driven to Yank Sing Restaurant. The UCE gave CHOW an envelope which contained $1,500. UCE 4599 told CHOW the business with Elaine LIANG and GEE was going well. UCE 4599 surmised LIANG was the "Dragon Lady"(Boss). CHOW replied "She is." The UCE told CHOW that GEE was sending 800 pounds of marijuana per month to the east coast. CHOW thought there were a lot of confidential informants (CI) who were reporting derogatory information against CHOW. CHOW thought CI's used CHOW's name as a get out of jail free card. According to CHOW, there have been several large organized crime busts within the last ten years which may have contributed to law enforcement's suspicion of CHOW. CHOW admitted to associating with people who were involved in illegal activities. According to CHOW, he made a point never to ask these individuals about their criminal business. UCE 4599 told CHOW that when he conducts illegal business with NIEH they purposefully kept CHOW out of it. The UCE then explained the concept of La Cosa Nostra (This Thing Of Ours) and the principles of organized crime. CHOW thought establishing roles within a criminal organization was "common sense."

On October 4, 2013, UCE 4872 arranged a meeting with an associate of GEE in a parking lot of a coffee shop located in Atlanta, Georgia to conduct a money laundering transaction. The cash total was later confirmed to be $150,000. The associate provided the cash to UCE 4599. On October 8, 2013, NIEH picked up UCE 4599 in San Francisco and drove to meet GEE. UCE 4599 delivered $144,000 cash. GEE said he would be traveling to China and asked UCE 4599 to conduct future deals with Anthony LAI. UCE 4599 paid NIEH $600 for facilitating this money laundering deal.

On October 8, 2013, UCE 4599 arranged a meeting with RINN ROEUN at his place of employment, an automobile glass repair shop, located in San Francisco, California, to purchase a firearm. UCE 4599 drove to 863 Bryant Street, San Francisco to meet with ROEUN. Once at the location, ROEUN entered UCE 4599's vehicle. UCE 4599 provided ROEUN with $1,000. ROEUN gave the handgun to UCE 4599. ROEUN told the UCE he had several other assault rifles that would be

73

available for purchase in the near future. Upon inspection, the handgun was a Taurus, Model Judge, .45 caliber.

On October 10, 2013, UCE 4599 arranged a meeting with LI and CHANTHAVONG at a restaurant in San Francisco. The purpose of the meeting was to discuss illegal business opportunities with LI and CHANTHAVONG. LI asked UCE 4599 if he had the capability to launder drug proceeds in a similar fashion as to what UCE 4599 was doing in New Jersey with NHINGSAVATH. LI advised he was looking to launder approximately $80,000 on a routine basis. UCE 4599 told LI he would charge a higher percentage fee to launder the money because it was a smaller amount than UCE 4599 usually dealt with. UCE 4599 told CHANTHAVONG he spoke with his associates in New Jersey and would be able to produce large quantities of Johnny Walker Black for $22.00 per bottle. CHANTHAVONG said he would check with his associates to see if they would be interested. LI, CHANTHAVONG and UCE 4599 discussed ways to hide assets so they could not be detected by government authorities. UCE 4599 thought it was a bad idea to hide assets by putting them in their girlfriend's name. LI told UCE 4599 that CHOW hides his assets by putting them under his girlfriend's name.

On October 15, 2013, UCEs 3010 and UCE 3129 arranged a meeting with "Jimmy" [later identified as Gary CHEN] and another individual in a parking lot at a retail store located in Saugus, Massachusetts, to conduct a money laundering transaction. At the meeting location, GARY CHEN was in the front passenger seat. CHEN approached the UCE vehicle with a gray backpack retrieved from the trunk and entered the front passenger area of the UCE vehicle. GARY CHEN introduced himself as "Jimmy". UCE 3129 admonished GARY CHEN for being late. GARY CHEN apologized. GARY CHEN stated he had $102,500 and noted there was a paper note in the bag indicating such. UCE 3010 told GARY CHEN that it was nice doing business with GARY CHEN and hoped that the relationship would continue. All parties depart the area in the vehicles they arrived in. The cash amount was later confirmed to be $102,790.

On October 16, 2013, UCE 4599 arranged to meet with LAI at a restaurant in San Francisco. The purpose of the meeting was to provide LAI with $98,678 in laundered drug proceeds.  LAI met with UCE 4599 on behalf of GEE, who was in China at the time.  UCE 4599 provided LAI with a Federal Express Box containing $98,678.  LAI told UCE 4599 he operated an indoor marijuana cultivation operation in Oakland.  The aforementioned marijuana grow was robbed and subsequently shut down.  LAI did not bypass the power and owed PG&E approximately $22,000.  LAI told UCE 4599 when he first met UCE 4599 he thought UCE 4599 looked like a "narc" (undercover narcotics officer).  UCE 4599 dismissed the notion and told LAI he had been associated with CHOW for almost four years and was time tested when it came to trust.  UCE 4599 and LAI discussed the next money laundering opportunity in Boston scheduled for the following week.  Both departed from the restaurant at the conclusion of the meeting.  **I believe this demonstrates probable cause for a violation of Title 18, United States Code, Sections 1956(a)(1)(A) and (B) and 2 by Elaine LIANG, GEE, CHEN, and LAI.**

On October 17, 2013, UCE 4599 arranged to meet KEITH JACKSON and MARLON SULLIVAN at a restaurant located in San Francisco.  The purpose of the meeting was to discuss illegal activities with SULLIVAN and KEITH JACKSON.  SULLIVAN and KEITH JACKSON were upset with the lack of progress regarding a purported cocaine transaction with UCE 4599's fictitious source of supply (SOS) for cocaine.  UCE 4599 told SULLIVAN and KEITH JACKSON that due to a recent interdiction by law enforcement, UCE 4599's SOS was revamping his cocaine distribution strategy.  According to KEITH JACKSON, they had money already allocated for the deal and were disappointed in the lack of progress.  SULLIVAN asked UCE 4599 if he had the ability and resources to transport narcotics. UCE 4599 asked SULLIVAN if he still had the Postmaster contact in Memphis, Tennessee who facilitated the transportation of marijuana though the USPS.  SULLIVAN acknowledged he still had the Postmaster contact.